UNITED STATES, Appellee,

v.

Thomas C. RAYMOND, Private First Class U.S. Army, Appellant.

No. 68,320.
CMR No. 9102830.

U.S. Court of Military Appeals.

Argued April 15, 1993.

Decided Sept. 28, 1993.

For Appellant: *Captain Lawrence W. Andrea* (argued); *Lieutenant Colonel James H. Weise* and *Major Robin L. Hall* (on brief); *Colonel Malcolm H. Squires, Jr.*

For Appellee: *Major Donna L. Barlett* (argued); *Colonel Dayton M. Cramer, Lieutenant Colonel Joseph A. Russelburg* (on brief).

*Opinion of the Court*

CRAWFORD, Judge:

Appellant was convicted, pursuant to his pleas, of two specifications of committing an indecent act upon a female under the age of 16 years, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. He was sentenced to a dishonorable discharge, confinement for 5 years, total forfeitures, and reduction to Private E1. In accordance with a pretrial

agreement, the convening authority approved only so much of the sentence as provided for a dishonorable discharge, confinement for 42 months, total forfeitures, and reduction to Private E1. The Court of Military Review affirmed the findings and sentence without opinion. This Court granted review [1] of the following issue personally raised by appellant: [2]

WHETHER THE MILITARY JUDGE ERRED BY DENYING THE DEFENSE MOTION TO EXCLUDE THE TESTIMONY OF MICHAEL WINSTON. 37 MJ 14

We hold that the military judge did not err by admitting Mr. Winston's testimony because as a matter of law: (A) Mr. Winston, in his capacity as a social worker subject to Army Regulation (AR) 608–18 (September 18, 1987), was not acting as an investigative agent of law enforcement, and (B) Article 31, UCMJ, 10 USC § 831, does not apply to health-care professionals engaged in patient treatment.

## FACTS

Mr. Michael Winston was a psychiatric social worker at the Army hospital in Wuerzberg, Germany, and was independently contacted and consulted by appellant on a walk-in basis for therapy after the charged offenses came to light. The two discussed the allegations for over one hour, and during this time appellant admitted to the allegations against him but asserted that he "didn't feel that society had a right to judge him." This testimony was presented by the Government during the presentencing phase of appellant's trial to demonstrate appellant's lack of remorse for the crimes.

Before contacting Mr. Winston, appellant was interviewed by Special Agent (SA) Paulette L. Knor of the Criminal Investigation Command (CID), concerning the charged offenses. She advised appellant of his rights under Article 31, and appellant declined to make a statement. SA Knor noted that appellant's manner of talking and demeanor were withdrawn and subdued during the interview, and she became concerned about his mental health. SA Knor suggested psychological counseling, and appellant agreed.

After interviewing appellant, SA Knor lawfully searched his room and found letters he wrote to a friend concerning suicide and death, and a poem in appellant's wallet on the same subject. Additionally, SA Knor knew of appellant's involvement with a medieval board game, Dungeons and Dragons. SA Knor presented this information to appellant's first sergeant and commander, and they concluded that an expe-

1. We heard oral argument in this case at Fort Gordon, Georgia, on April 15, 1993, without objection from the parties involved. *See* Foundation of the Federal Bar Association, *Equal Justice Under Law: The Supreme Court in American Life* 15–18 (1965); *see also* D. O'Brien, *Storm Center: The Supreme Court in American Politics* 78, 135–40 (2d ed 1990). This procedure is similar to the well-established practice of the United States Court of Appeals for the Eighth Circuit which holds hearings at various law schools within its circuit. The United States Court of Military Appeals conducts hearings such as this outside of its permanent courthouse in Washington, D.C., as part of its "Project Outreach," a public awareness project which demonstrates not only the operation of a Federal appellate court, but also the quality and effectiveness of the criminal justice system of our Armed Services and the Uniform Code of Military Justice (Arts. 1–146, 10 USC §§ 801–946, respectively). The project exposes students, servicemembers, military and civilian attorneys, and the American public who witness these hearings to a democratic America capable of maintaining an Armed Force instilled with the appropriate discipline to make it a world power and yet able to afford the members of that Armed Force a fair and impartial justice system which provides to its members all protection of the United States Constitution and Federal laws "except those which are expressly or by necessary implication inapplicable." *United States v. Jacoby,* 11 USCMA 428, 430–31, 29 CMR 244, 246–47 (1960).

2. We also granted review on the Appointments Clause and tenure issues raised by appellate defense counsel. Since the grant of review in this case, this Court has held against appellant's position on both issues in *United States v. Weiss,* 36 MJ 224, 225 n. 1 (CMA 1992), *aff'd,* —— U.S. ——, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994).

dited psychiatric referral was in order. Appellant's commander prepared a Unit Commanders' Report for Psychiatric Evaluation, and an appointment for appellant was scheduled.

Two days after the interview, SA Knor contacted Mrs. Sharon Delapaz at Social Work Services and expressed concern that appellant was scheduled to see only a mental health counselor, who was only an E4 or E5. SA Knor was concerned that appellant might need more immediate and a higher level of counseling and explained to Mrs. Delapaz appellant's demeanor, his letters, and his involvement with Dungeons and Dragons.

Appellant never made it to his command-directed psychiatric appointment; he instead went to the hospital on his own and asked for a "walk-in" appointment at the psychiatric clinic where Mr. Winston happened to be on duty. Appellant arrived without any command-referral document, and Mr. Winston had no communications at all with the command before or after appellant's walk-in appointment. Several days later, Mr. Winston got the Commanders' Report for Psychiatric Evaluation from appellant's commander.

Appellant mentioned that he was facing charges, and Mr. Winston noticed that appellant was escorted to the clinic. Appellant also mentioned that "someone from CID would contact" Mr. Winston or that Mr. Winston should contact someone at the CID. Mr. Winston "didn't pay any attention to that" and "had no intentions . . . of ever calling CID." Further, Mr. Winston did not perceive his role as law enforcement. Mr. Winston had no knowledge before or during the interview that appellant had been interviewed by the CID and had refused to make a statement.

### A

█ AR 608–18 is a personnel regulation, not a law enforcement regulation. "The proponent agency of this regulation is the Office of the Deputy Chief of Staff for Personnel." AR 608–18 UPDATE at 1. Its purpose is to establish "Department of

the Army (DA) policy on the prevention, identification, reporting, investigation, and treatment of spouse and child abuse." Para. 1–1, AR 608–18. It sets out the Army policy "to prevent spouse and child abuse, to protect those who are victims of abuse, to treat families affected by abuse, and to assure that there are personnel who are professionally trained to intervene in abuse cases." Para. 1–4a. The regulation does not establish criminal investigation policy but merely "recognizes a commander's authority to take disciplinary or administrative action in appropriate cases." Para. 1–4a.

The regulation "assigns responsibility for the Family Advocacy Program (FAP)." Para. 1–1. It establishes the objectives of the FAP, which are "to prevent spouse and child abuse, to encourage the reporting of all instances of such abuse, to ensure the prompt investigation of all abuse cases, to protect victims of abuse, and to treat all family members affected by or involved in abuse so that those families can be restored to a healthy state." Para. 1–5. The regulation provides that "every soldier, employee, and member of the military community" has a duty to report "known and suspected cases of child abuse" to a point of contact, which can be either a military treatment facility emergency room or a military police desk. Paras. 3–8a and 3–9a.

The Family Advocacy Program Manager at each Army installation is not a criminal investigator but is required to be "a social services professional with a master's degree or equivalent experience in behavioral science and with a range of administrative, management, prevention, and direct service experience, and will be capable of handling the complex issues associated with spouse and child abuse." Para. 2–2.

It should be apparent from the foregoing that the Army regulation establishes a comprehensive program accommodating the competing needs of the military community. It is not a law enforcement program; it is a community services program. The cooperative effort required by the regulation does not render every member of

the military community a criminal investigator or investigative agent but, rather, merely ensures that the competing interests of various segments of the military community accommodate each other as much as possible.

Many states require health-care providers and teachers to report allegations of child abuse to appropriate agencies to prevent future abuse. *Cf.* Lombard, Michalak, & Pearlman, *Identifying the Abused Child: A Study of Reporting Practices of Teachers,* 63 U. Det. L.Rev. 657, 658 n.6 (listing statutes) (1986). This reporting requirement does not make them law enforcement personnel for the purposes of *Miranda* warnings. *See, e.g.,* W. La Fave & J. Israel, *Criminal Procedure* § 6.10c (1984 & Supp.1991).

We hold, therefore, that Mr. Winston was not acting as an investigative agent of law enforcement.

### B

■ The predecessor to Article 31 was Article of War 24, adopted in 1916. Act of August 29, 1916, Pub.L. No. 64–242, § 3, 39 Stat. 654. The obligation to warn was first announced in paragraph 225(b), Manual for Courts–Martial, U.S. Army, 1917. It provided as follows:

> Considering, however, the relation that exists between officers and enlisted men and between an investigating officer and a person whose conduct is being investigated, and the obligation devolving upon an investigating officer to warn the person investigated that he need not answer any question that might tend to incriminate him, confessions made by soldiers to officers or by persons under investigation to investigating officers should not be received unless it is shown that the accused was warned that his confession might be used against him or it is shown clearly in some other manner that the confession was entirely voluntary.

Article 31 was adopted in 1950. Pub.L. No. 81–506, ch. 169, § 1, 64 Stat. 118. Article 31(b) provides:

> No person subject to this chapter may interrogate, or request any statement from accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

The purpose of this provision was described in *United States v. Gibson,* 3 USCMA 746, 752, 14 CMR 164, 170 (1954), as follows:

> Careful consideration of the history of the requirement of warning, compels a conclusion that its purpose is to avoid impairment of the constitutional guarantee against compulsory self-incrimination. Because of the effect of superior rank or official position upon one subject to military law, the mere asking of a question under certain circumstances is the equivalent of a command. A person subjected to these pressures may rightly be regarded as deprived of his freedom to answer or to remain silent.

Finally, in *United States v. Duga,* 10 MJ 206, 210 (CMA 1981), then Chief Judge Everett stated:

> Therefore, in light of Article 31(b)'s purpose and its legislative history, the Article applies only to situations in which, because of military rank, duty, or other similar relationship, there might be subtle pressure on a suspect to respond to an inquiry.

*See also United States v. Armstrong,* 9 MJ 374, 378 (CMA 1980) (Everett, C.J.) (Article 31(b) warning necessary "because of subtle pressures which existed in military society," citing Hearings on H.R. 2498 Before a Subcomm. of the House Armed Services Comm., 81st Cong., 1st Sess. 984–85 (1949), *reprinted in* Index and Legislative History, Uniform Code of Military Justice (1950)).

In 1980 Mil.R.Evid. 305(b)(1), Manual for Courts–Martial, United States, 1969 (Revised edition), became effective. It stated:

*Person subject to the code.* A "person subject to the code" includes a person acting as a knowing agent of a military unit or of a person subject to the code. *See* Mil.R.Evid. 305(b)(1), Manual for Courts–Martial, United States, 1984. Here there was no interrogation by an officer, an investigative officer, or, as discussed in Part A herein, by "a person acting as a knowing agent of a military unit or of a person subject to the code." Mr. Winston was neither a superior officer of appellant nor a person occupying an official position such that appellant would feel compelled to answer his questions. In fact, appellant voluntarily sought counseling on a walk-in basis at the base hospital.

Earlier cases of this Court indicate that, when a military doctor is questioning an individual for diagnostic purposes, there is no requirement to give an Article 31 warning. *United States v. Fisher,* 21 USCMA 223, 44 CMR 277 (1972); *United States v. Baker,* 11 USCMA 313, 29 CMR 129 (1960). In fact, in *Baker* the Navy doctor who questioned the suspect regarding track marks on his arm was asking the questions so he could help him with an insomnia problem. *Cf. United States v. Moreno,* 36 MJ 107, 114 (CMA 1992) (A mental health worker's inquiry was not so "merged" with a military law enforcement or unit investigation as to require Article 31(b) warnings.).

More recently in *United States v. Moore,* 32 MJ 56 (1991), this Court held that a psychiatric nurse was not required to warn a child sexual abuse suspect. The Court determined the nurse's official capacity as a government employee at a military hospital and her *regulatory duty* to file reports of suspected child abuse with her military supervisors did not require a rights warning because the regulation was not in effect at the time of the interview. Even absent regulatory reporting requirements, there is no historical duty of health professionals engaged in treatment to warn based on the purpose behind Article 31(b). *See, e.g., United States v. Gibson,* 3 USCMA 746, 14 CMR 164 (1954).

We hold that Mr. Winston's position is so attenuated from those required to warn under Article 31 and Mil.R.Evid 305 that no warning was required by him.

The decision of the United States Army Court of Military Review is affirmed.

Judges COX and GIERKE concur.

WISS, Judge (concurring in the result):

The evidence of record fully supports the military judge's finding that the agent of the Criminal Investigation Command (CID) helped appellant get to a mental-health counselor out of sincere, well-motivated concerns for appellant's mental condition and not at all as a subterfuge to use the mental-health counselor as an unknowing stalker of evidence to further the agent's criminal investigation. It is unnecessary, under these circumstances, to address the broad question flowing from *United States v. Moreno,* 36 MJ 107 (CMA 1992), that touches upon whether a civilian Army employee/counselor should be viewed as a matter of law as a part of a criminal investigation. That question would arise under facts that suggest, more than those in this case do: 1) that the CID used the counselor in that sense or 2) either that the counselor knew he had a regulatory duty to report the substance of a patient's conversations with him or in fact did report the substance of that conversation pursuant to such a regulatory duty. Accordingly, I do not join the majority's broad and gratuitous holding that, as a matter of law, "Article 31, UCMJ, 10 USC § 831, does not apply to health-care professionals engaged in patient treatment." 38 MJ at 137.

I

Appellant's indecent acts with the 11–year-old daughter of some friends of his came to light when a friend of the young girl told the girl's parents what the girl had told her. The parents notified the CID, and on July 29, 1991, CID Agent Paulette Knor interviewed appellant about the allegations. He invoked his Article 31 rights, so she ceased the interview and suggested

that he see an attorney. *Before leaving, though, appellant indicated to Agent Knor that he wanted mental-health counseling.* Knor advised him to tell his first sergeant so that an appointment could be made.

Knor, however, was "concerned for his mental health." Appellant's demeanor and "withdrawn nature" during her session with him raised concerns, which were heightened when she subsequently

> went up to his room and reviewed his letters and his writings and the poem that he had in his wallet, he seemed to have a dark side to his nature. He was involved in Dungeons and Dragons, I knew that. He also talked a lot about death. He had a friend that they wrote back and forth about suicide and death and things like that, and I was concerned for his health, his mental health. I thought that he might attempt to do something to harm himself.

As a result of her concerns, on July 31 Knor spoke with

> some mental health counselors regarding PFC Raymond's attitude and demeanor and so forth during the interview, and during my review of some his letters and so forth in his room, and the mental health counselors suggested yes, that they thought that he needed to have help sooner than the scheduled appointment that he had, and they told me how to go about doing that, that the commander could have him admitted to the Emergency Room. And so, that's what I did. I told the commander that and he agreed to have that done.

Michael Winston was the psychiatric social worker who ultimately saw appellant later that same day—July 31. He is a civilian employee of the Army, working at the Army hospital in Wuerzburg, Germany. He saw appellant as a "walk-in"—meaning, having no appointment. Even though appellant did not have a command-referral form, Winston assumed that he was, in fact, command-referred because appellant told him so. Appellant also told Winston that he was facing charges—and, in fact,

appellant was under escort when he came to Winston (though the escort remained outside their presence during their session).

When Winston spoke with appellant on that occasion, he did not "perceive [his] role as acting as an agent for the government ... any more than I normally do, because I work for the government." When asked whether he felt like he was "acting as an extension of law enforcement in any way," he answered, "None at all, no." Neither did he know, in fact, that appellant already had seen someone from CID. Winston never spoke with anyone in appellant's command either before or after his session with appellant. Neither did he talk to anyone from CID before he saw appellant, and at no time did he have any "intention of calling CID."

About a week later, however, Agent Knor called Winston. She had continued her investigation of appellant after her short interview of him and had learned that appellant had seen a mental-health counselor. She met with Winston. She did not tell him that she had seen appellant before he had or that she had gotten the commander to refer appellant. All she did, apparently, was ask Winston what appellant had said to him, write it down, and get Winston to sign it.

During litigation of admissibility of Winston's testimony about what appellant had told him, the defense argued in essence that, while Winston was not subject to the UCMJ and while he may not have been aware that he was being used in a criminal investigation, in fact that was the case: People who were subject to the UCMJ (Knor and the commander) had used Winston as a means of getting to appellant. When the military judge pointedly asked defense counsel if he had any evidence at all of Knor's bad faith—that she had not really acted out of concern for appellant's mental health—counsel responded that he did not. He could only mention the fact that it had taken Knor 2 days to act on her concern (though, as the military judge pointed out, it was during those 2 days that she had visited his room and had seen the

material there that had heightened her concern). Counsel essentially acknowledged, as well, that he had no evidence that anyone in appellant's command had used this as a guise to get appellant talking, as opposed to acting out of legitimate concern for appellant's mental health.

Ultimately, the military judge denied appellant's motion to suppress Winston's testimony, reasoning as follows:

> I'm satisfied that there's no motive or improper motive on the part of CID in trying to get assistance for PFC Raymond. And I'm satisfied that based on the testimony of the agent that her intentions were [as] honorable as they can be under the circumstances; that they were not a subterfuge to try to get information or incriminating statements from PFC Raymond or evidence to be used against him; that the social worker, Mr. Winston, was acting in his capacity as a psychiatric counselor, not as an investigative agent on the part, knowing or unknowingly on the part of the government to secure incriminating statements or admissions by PFC Raymond.

## II

A statement requested by a person not otherwise subject to to the Uniform Code of Military Justice may violate Article 31 either because, under the facts, it is clear that the person was an agent of a military criminal investigation or because, as a matter of law, the person occupies a position that is deemed to be a part of a military criminal investigation. *See, e.g., United States v. Quillen*, 27 MJ 312 (CMA 1988). The Court's more recent cases dealing with social worker/psychological counseling have stopped short of holding that such counselors are, as a matter of law, adjuncts to law enforcement. *See United States v. Moreno, supra; United States v. Kline*, 35 MJ 329 (CMA 1992). *But cf. United States v. Fisher*, 21 USCMA 223, 44 CMR 277 (1972).

As to the first possibility just mentioned—whether, under the facts, Winston could be viewed as a participant in the criminal investigation and that his session with appellant was at least partially devoted to that end—the answer is especially clear. The military judge's findings of fact to the contrary are fully supported by the evidence, and the decision in *United States v. Moore*, 32 MJ 56, 60 (CMA 1991), is dispositive against appellant.

As to the second possibility—whether Winston was an adjunct of the criminal investigation as a matter of law—I am not comfortable with the majority's unqualified conclusion that Army Regulation (AR) 608-18 (September 18, 1987), upon which such a legal status would rest, "is a personnel regulation, not a law enforcement regulation." 38 MJ at 138. AR 608-18 is entitled, "The Army Family Advocacy Program." It establishes the objectives of the program as follows: "[T]o prevent spouse and child abuse, to encourage the reporting of all instances of such abuse, to ensure the prompt investigation of all abuse cases, to protect victims of abuse, and to treat all family members affected by or involved in abuse so that those families can be restored to a healthy state." Para. 1-5. To the end of identifying and treating both the causes and the effects of spousal and child abuse, the regulation places interactive responsibility on a wide range of officials. To that extent, it is fair to say that it is not purely a "law enforcement regulation."

It is also fair, however, to recognize that there are clear-cut law enforcement concerns and responsibilities throughout the provisions of this regulation. Without fully exhausting those provisions, let me illustrate by pointing out the following from AR 608-18:

> In most instances, the central location for receiving reports of abuse should be the MTF [medical treatment facility] emergency room or MP [military police] desk, when available. [Para. 3-8a ]

> \* \* \*

> Every soldier, employee, and member of the military community will report information about known and suspected cases of child abuse to the RPOC [report

point of contact] or the appropriate military law enforcement agency as soon as the information is received.... [Para. 3–9a]

All installation law enforcement pesonnel and physicians, nurses, and other medical personnel will report information about known and suspected cases of spouse abuse requiring law enforcement assistance or medical treatment or hospitalization.... [Para. 3–9b]

\* \* \*

Social workers, medical personnel, and law enforcement personnel share a common interest in ensuring that all reports of spouse and child abuse are promptly and fully investigated.... [Para. 3–14b]

Both social workers and law enforcement personnel have a responsibility to protect the victims of abuse from further physical and emotional harm.... [Para. 3–14c]

The objectives of any investigation of a reported spouse or child abuse case are—

a. To gather all of the evidence by every lawful means available, including, when appropriate, the use of—

(1) Search authorizations (M.R.E. 315, MCM) or warrants

(2) Authorizations to apprehend (Rule for Courts–Martial (R.C.M.) 302 MCM) or warrants to arrest.

\* \* \*

c. To gather the evidence in a lawful manner by—

(1) Properly advising soldiers suspected of criminal acts of abuse of their rights under article 31, UCMJ, before questioning them about suspected or known instances of abuse.

(2) Ensuring appropriate command and law enforcement involvement in any medical or social work inquiry of a child abuse case whenever there is probable cause to believe that a criminal act of abuse has occurred (e.g., assault, battery, indecent assault, indecent exposure). [Para. 3–15]

\* \* \*

In order to accomplish the objectives set forth in paragraph 3–15, this regulation mandates a cooperative effort by law enforcement, medical, and social work personnel in all spouse and child abuse investigations, to include a sharing of information and records insofar as permitted by law and regulation.... [Para. 3–16]

Under article 31, UCMJ, a person or a civilian agent of a person subject to the UCMJ may not question a soldier suspected of an offense 'without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.' In addition, a suspect must be advised of his or her right to counsel set out in Military Rule of Evidence (M.R.E.) 305. [Para. 3–24a]

\* \* \*

Appendix D, Privileged Communications There is no physician-patient privilege in the military.... [Para. D–2]

There is no social worker-client privilege in the military. [Para. D–3]

Perhaps, the real difficulty with any analysis as to whether physicians and social workers are, in law, an adjunct of law enforcement by virtue of their regulatory reporting responsibility is this: The regulatory duty is in combination with absence of any evidentiary privilege in a court-martial concerning communications between someone who is a criminal suspect or accused but who also is a patient. Reporting spousal or child abuse that comes to the attention of medical personnel quite clearly is a high social priority, and it is not conceptually unique to the military community. *Cf.* Lombard, Michalak and Pearlman, *Identifying the Abused Child: A Study of Reporting Practices of Teachers,* 63 U.Det.L.Rev. 657, 658 n.6 (listing statutes) (1986). In combination, however, with the lack of any evidentiary privilege regarding

the substance of communications between the likely abuser and the medical personnel—at least in the context where that abuser is a patient of the medical personnel—the reporting requirement can be an end-run around Article 31.

In this case, I am satisfied that did not occur. Mr. Winston did not in fact report any abuse by appellant—Agent Knor already knew of it. Neither did Mr. Winston figuratively raise his hand to indicate that appellant had seen him about the subject matter that also was being criminally investigated. Agent Knor learned of that through her own continued investigation. On this basis, I believe that the circumstances, in law, are the same as if there were no reporting requirement at all.

I must acknowledge, however, that I am troubled by the combination of a reporting requirement and the absence of an evidentiary privilege. Where the reporting requirement raises a red flag for law enforcement agents that leads them to evidence and where the absence of a privilege raises no bar to admissibility of that evidence in a court-martial, I believe it is entirely logical to argue under certain circumstances that the Government—through interaction of two provisions of law that are entirely within its power to effect—has improperly undermined Article 31.

Because the majority opinion categorically dismisses such a possibility, I expressly do not associate myself with it. Because that possibility did not occur here, however, I do join in the disposition of the appeal.

SULLIVAN, Chief Judge (dissenting):

I respectfully dissent. I cannot join in the majority's creation of an "accommodation theory" which beclouds the realities of military life behind a legal fiction. 38 MJ at 138.[1] Whether a "personnel" regulation or a "law enforcement" regulation, Army Regulation (AR) 608-18, The Army Family Advocacy Program (September 18, 1987) establishes an agency relationship between Army social workers and military law enforcement authorities which cannot be gainsaid. Thus, I would hold that the military judge erred, as a matter of law, in overruling defense counsel's objection to admission of Mr. Winston's testimony during sentencing. *Cf. United States v. Moreno*, 36 MJ 107, 117 (CMA 1992).

After the military judge accepted appellant's pleas of guilty and announced his findings, the Government called Mr. Winston, a psychiatric social worker at the Army Hospital in Wuerzburg, Germany, to testify about a psychiatric counseling session he had with appellant on July 31, 1991. After hearing testimony from Mr. Winston and Special Agent (SA) Knor from the Criminal Investigation Command (CID), the military judge denied the defense motion to exclude Mr. Winston's testimony. Mr. Winston then testified that appellant, a 19-year-old male, made statements to the effect that society had no right to judge him in his sexual relationship with an 11-year-old girl.

Mr. Winston testified that he understood appellant to be a self-referral, although appellant was escorted to the hospital by

---

1. The majority opinion has failed to reconcile its position that Army Regulation (AR) 608-18, The Army Family Advocacy Program (September 18, 1987) is not a law enforcement regulation, 38 MJ at 138, with the clear language in Section IV, Investigation of Spouse and Child Abuse Incidents. For example, paragraph 3-14a discusses physical evidence obtained during investigations which may be "relevant to the crime at issue." Paragraph 3-14b states that social workers and law enforcement personnel "share a common interest" in fully investigating reports of child abuse. Paragraph 3-16 states "this regulation mandates a cooperative effort by law enforcement, medical, and social work personnel in all spouse and child abuse investi-gations, to include a sharing of information and records insofar as permitted by law and regulation." Paragraphs 3-17 and 3-18 require social workers to immediately report known or suspected child abuse to the military police or a medical emergency treatment facility which will in turn report to the military police. Finally, paragraph 3-15 makes specific references to search authorizations under Mil.R.Evid. 315, Manual for Courts-Martial, United States, 1984, and authorizations to apprehend under RCM 302, Manual, *supra.* AR 608-18 clearly mandates specific law enforcement activity and contemplates the active involvement of social workers employed in military hospitals when they know or suspect child abuse.

another soldier. Several days after the psychiatric counseling session, Mr. Winston did receive a Command Request for Psychiatric Evaluation of appellant. However, Mr. Winston testified that, at the time appellant came to see him, Mr. Winston believed that appellant was a walk-in, self-referred patient. The record, however, provides some suggestion that appellant was directed to go to the Army Hospital by his commander or a member of appellant's chain of command.[2]

During examination by trial counsel, Mr. Winston testified that appellant "told [him] that he was facing charges." Mr. Winston further testified that, in performing his duties as a psychiatric counselor, he "didn't feel like [he was] acting as an extension of law enforcement in any way[.]" He also testified that he "had no intention of calling CID." Eight days after appellant spoke with Mr. Winston, SA Knor went to speak with Mr. Winston about appellant's case. SA Knor testified that Mr. Winston spoke to her about appellant's case only after Mr. Winston "talked to his chief first, to verify if it was okay to talk to CID about what was said, and the chief said, yes, that was not a problem, and so he told me what happened." Mr. Winston gave SA Knor a copy of the record of the psychiatric counseling session with appellant.

This Court took judicial notice of AR 608–18 during open appellate proceedings in this case conducted on April 15, 1993, at Fort Gordon, Georgia.[3] During oral argument by appellate defense counsel, we specifically directed counsel's attention to this service regulation which states in pertinent part:

*Social workers, medical personnel, and law enforcement personnel share a common interest in ensuring that all reports of spouse and child abuse are promptly and fully investigated.* A prompt and full investigation is particularly important in a child abuse case because such cases often involve victims who are too young or too frightened to explain what happened to them, or to even report it. In child abuse cases, the prompt gathering of physical evidence, before it disappears or is destroyed, is essential.

Para. 3–14b, AR 608–18 (emphasis added).

I now note a second paragraph of that same regulation which states:

### 3–16. Cooperative effort

In order to accomplish the objectives set forth in paragraph 3–15, [Objective of Investigation] *this regulation mandates a cooperative effort by law enforcement, medical, and social work personnel in all spouse and child abuse investigations, to include a sharing of information and records insofar as permitted by law and regulations. (See para. 6–2b on the Army policy in sharing record information.)*

(Emphasis added.) Both appellate defense counsel and appellate government counsel addressed, during oral argument before this Court, the applicability of AR 608–18 to the case *sub judice.*

The granted issue asks whether evidence of statements made by appellant to a civilian social worker, employed in a military hospital, was admissible at his court-martial. Appellant at trial and on appeal has asserted that his counseling session with Mr. Winston was orchestrated by a CID

---

**2.** Exhibit 17 of the Criminal Investigation Command (CID) Report of Investigation, dated August 13, 1991, includes a Personal History Questionnaire which accompanied the Psychiatric Evaluation prepared by Mr. Winston on August 6, 1991. Item A of the questionnaire states that one of the reasons appellant sought psychiatric assistance was because he was directed by his chain of command. During appellate defense counsel's oral argument, he represented to this Court that appellant completed the questionnaire as part of in-take procedures at the Army

Hospital prior to seeing Mr. Winston. Exhibit 17 is included in the Allied Papers and was not offered as evidence by either party during appellant's court-martial.

**3.** This Court has previously held that Mil. R.Evid. 201(f), Manual, *supra,* "would permit judicial notice of a general regulation of an armed force to even be taken by an appellate tribunal." *United States v. Mead,* 16 MJ 270, 273 (CMA 1983).

agent to avoid or subvert the warning requirements of Article 31(b), Uniform Code of Military Justice, 10 USC § 831(b). *See United States v. Penn,* 18 USCMA 194, 199, 39 CMR 194, 199 (1969); *United States v. Grisham,* 4 USCMA 694, 696, 16 CMR 268, 270 (1954). The military judge resolved this challenge against appellant as a matter of fact. However, I note that an applicable Army regulation, AR 608–18, imposed a duty on this social worker to *jointly investigate* and report information acquired from suspected child abusers to military law enforcement authorities.[4] Accordingly, a related question is whether statements made by a suspected servicemember during counseling sessions with a social worker *so obliged* could be evidenced in court without proper Article 31(b) warnings. *See* Art. 31(d); Mil.R.Evid. 305, Manual for Courts–Martial, United States, 1984. *See generally United States v. Moreno,* 36 MJ 107 (CMA 1992); *United States v. Moore,* 32 MJ 56 (CMA 1991); *United States v. Quillen,* 27 MJ 312 (CMA 1988).

In *United States v. Moreno, supra,* a majority of this Court held that a civilian social worker employed by the State of Texas was not an "agent or instrumentalit[y]" of the military. 36 MJ at 115. This conclusion was based on the fact that the social worker was neither employed by the military nor involved in the military investigation of offenses committed by Staff Sergeant Moreno. This Court also noted that the state social worker had an independent duty to investigate child abuse under the laws of a different sovereign, *i.e.,* the State of Texas. *Id.* at 115–16.

The majority concluded in *Moreno* that there was an absence of a demonstrated agency relationship between the social worker and the military. *Id.* at 117 (one prime element of agency is some degree of control by principal over agent's activities). However, writing for the majority, Judge Cox stated:

> At the same time, we hasten to point out that, had [the social worker] been functioning as a mere conduit for military authorities or had there appeared to be some sort of tacit understanding designed to subvert the purposes of Article 31, we would have had little difficulty in reaching a very different conclusion.

*Id.* at 117.

In *United States v. Quillen, supra,* a majority of this Court relied, in part, on Army regulations in holding that a civilian post exchange detective was required to advise an accused of his rights under Article 31(b) before questioning him about suspected offenses. 27 MJ at 314. This conclusion was based, in part, on the civilian detective's employment relationship to military authorities and her role in military investigations. *Id.* at 314–15. This Court noted that the civilian detective was employed by military authorities and the military authorities controlled her activities.

---

4. I am certainly aware of the potential effects that rights warnings may have on the relationship between the soldiers seeking psychiatric counseling and the professional rendering the counseling services. *See generally* Saltzburg, *Privileges and Professionals: Lawyers and Psychiatrists,* 66 Va. L.Rev. 597, 606–09, 620 n.78 (1980) (discussing chilling effect of rights warnings). However, paragraph 3–24d, AR 608–18, already requires such warnings when child abuse is suspected by health care professionals. *See also United States v. Kline,* 35 MJ 329, 335–36 (CMA 1992). Furthermore, this Court has previously held that, if the regulation is designed to protect the rights of the accused, the exclusionary rule may be applied. *United States v. McGraner,* 13 MJ 408, 415–18 (CMA 1982)(*citing United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979)). In order to invoke the exclusionary rule, the regulation must be promulgated in order to "implement . . . due process rights or to provide specificity to some general standard contained in the Constitution, the Uniform Code, or the Manual for Courts–Martial." *United States v. McGraner, supra* at 418. *Compare United States v. Arguello,* 29 MJ 198 (CMA 1989) (when regulation confers a right or which benefits an individual, Government is bound by regulation) *with United States v. Whipple,* 28 MJ 314, 316 (CMA 1989) (absence of legal observer when urine sample taken was minor violation of regulations and did not render sample inadmissible). Paragraph 24d expressly imposes Article 31(b), UCMJ, 10 USC § 831(b), requirements on social workers in military hospitals, and that undoubtedly conferred a right on appellant. Moreover, the Government is not required to introduce such evidence to show the counseled soldier's guilt.

Furthermore, under applicable regulations, the civilian detective was "tasked with developing information for [crime] reports," which were filed "with appropriate military officers." *Id.* at 315 (citing AR 60–10 (March 15, 1984) and the Exchange Service Manual).

Finally, in *United States v. Moore, supra,* this Court opined that a civilian nurse employed at a military hospital was *not* required to give Article 31(b) rights warnings. 32 MJ at 60. The majority was particularly persuaded by the fact that "there was no evidence in this case that [the civilian nurse] was acting directly or indirectly in any law enforcement or disciplinary capacity in questioning appellant." *Id.* Most importantly, the Court refused to accept appellant's claim that an agency relationship existed between the civilian nurse and military authorities arising under AR 608–18. The Court specifically noted that AR 608–18 was not in effect at the time of the offenses. *Id.* at 61 (comparing *United States v. Quillen, supra,* in which an Army regulation did establish agency). The majority opinion herein clearly acknowledges that the sole reason the civilian nurse was not required to give rights warnings was the fact that AR 608–18 was not in effect at the time the interview occurred.

38 MJ at 140. The regulation here was certainly in effect and applicable to the interview between Mr. Winston and appellant at the time of the offense *sub judice.*[5]

Applying this Court's holdings in *Moreno, Quillen,* and *Moore* to the case *sub judice,* I conclude that admission of the challenged evidence was error under Article 31(d). Admittedly, the military judge found as fact that there was "no motive or improper motive on the part of CID in trying to get assistance for PFC Raymond" and that SA Knor's intentions "were not a subterfuge to try to get information or incriminating statements from PFC Raymond or evidence to be used against him." Nevertheless, as a matter of law, I conclude that Mr. Winston, in his capacity as a military social worker subject to service regulations, was acting "as an investigative agent ... on the part of the government[.]" *See State v. Harper,* 613 A.2d 945, 949 n.4 (Me.1992); *see also* W. LaFave & J. Israel, *Criminal Procedure* § 6.10c (1984 & Supp.1991) (citing *Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), applying *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), to civilian investigator of Internal Revenue Service).

---

**5.** The majority also erroneously relies on *United States v. Fisher,* 21 USCMA 223, 44 CMR 277 (1972), and *United States v. Baker,* 11 USCMA 313, 29 CMR 129 (1960), which stand for the proposition that a military doctor is not required to give Article 31(b) warnings when "questioning an individual for diagnostic purposes." 38 MJ at 140. The distinction between these earlier cases and the case now before this Court is that AR 608–18 explicitly establishes an additional purpose when military doctors, nurses, and social workers question individuals who are known or suspected of child abuse. In addition to gathering information for diagnostic and medical treatment purposes, the civilian social worker in a military hospital is now required by regulation to gather facts for the purpose of investigation by military police. AR 608–18, Sec. IV.