528

UNITED STATES

v.

Keith B. DUDLEY, 270–68–9881, Aviation Boatswain's Mate (Launching and Recovery Equipment) Second Class (E–5), U.S. Navy.

NMCM 94 01040.

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 16 Feb. 1994.

Decided 14 March 1995.

LT Gerard Wm. Wittstadt, Jr., JAGC, USNR, Appellate Defense Counsel.

LT D.M. Harrison, JAGC, USNR, Appellate Government Counsel.

Maj S.R. Thomas, USMCR, Appellate Government Counsel.

Before MOLLISON, Senior Judge, and CLARK and DeCICCO, JJ.

DeCICCO, Judge:

In this appeal, we hold that a military suspect's admission of a crime to a military physician was admissible at trial when the physician's questions were for diagnostic purposes. This holding applies even though the physician was aware of the individual's status as a suspect and did not provide appropriate rights warnings. We have also concluded that we are satisfied of the appellant's guilt beyond a reasonable doubt and that the sentence is not inappropriately severe. Accordingly, we affirm.

Contrary to his pleas, Petty Officer Dudley was convicted by a general court-martial, military judge alone, of unauthorized absence and forcible sodomy in violation of Articles 86 and 125, UCMJ, 10 U.S.C. §§ 886, 925. The military judge sentenced him to confinement for 3 years, forfeiture of $500 pay per month for 36 months, reduction to pay grade E–1, and a bad-conduct discharge. The convening authority approved the sentence. The appellant raises three issues in this appeal.[1]

1. I. THE MILITARY JUDGE ERRED WHEN HE DENIED APPELLANT'S MOTION TO SUPPRESS THE ORAL ADMISSION TO THE MEDICAL OFFICER ON BOARD THE USS CARL

*Facts*

On the night of 17 January 1993, the appellant met two naval reservists at an off-base bar. The two reservists, Petty Officer Brickwood and Airman [C], were assigned to the USS CARL VINSON (CVN–70), the appellant's ship, for their period of active duty training. These three individuals subsequently went to another bar and later to a store to purchase beer. They eventually went to the appellant's residence to drink the beer and play dice. The appellant's roommate, Petty Officer Rice, was also present. The four of them drank beer and played dice games until approximately 0300. At that time, Brickwood and [C] decided to spend the night at the appellant's residence. The appellant and Rice had their own bedrooms. Rice gave blankets and pillows to Brickwood and [C]. [C] removed his pants and he and Brickwood slept on separate couches in the living room area.

Some time after [C] had fallen asleep, he was awakened when he felt "something down on the lower half of my body ... someone under the sheet ... it was a head down there." Record at 168. [C] testified that his penis was in his assailant's mouth. [C] pushed the person away and felt whiskers on the person's cheek. The assailant attempted to initiate penile contact again, but this time [C] hit the assailant on the head with his elbow. [C] stated that he saw the back of the person in the moonlit room as the person "tip-toed" away to the bedroom. [C] described his assailant as a black, short, stocky male wearing white underwear. Of the four persons in the premises that night, the appellant was the only black person.

Once the assailant had retreated to the bedroom, [C] woke up Brickwood and said it was time to leave and told him why. They left the appellant's residence in a state of agitation. [C] reported the incident the following morning to Naval Criminal Investigative Service [NCIS] agent Harrison aboard the VINSON.

Both Brickwood and Rice denied sodomizing [C]. Brickwood described Rice as a white male who was not short. He also said that the appellant was the shortest individual of the four. He further testified that when [C] had awakened him, he saw the appellant come out of his bedroom with a robe on and ask what was going on. Rice testified that he had another black roommate named Donaldson, but Donaldson was not at home on the night of the incident. He said Donaldson is six feet, three inches tall and weighs between 250 and 260 pounds. Rice did not come out of his bedroom when [C] was awakened and apparently slept until after 1000 the next morning.

Agent Harrison investigated the incident. He interviewed the appellant on 1 February 1993, and the appellant denied any wrongdoing. Harrison offered the appellant a polygraph examination which the appellant accepted. Due to the ship's movement from Bremerton, Washington, to Alameda, California, the polygraph examination was delayed for a few months.

On 22 April 1993, Harrison transported the appellant from the ship to a nearby NCIS office where the polygraph was to be administered. The appellant was advised of his rights by NCIS agent Hill, and the appellant signed appropriate waivers of his rights.[2] Agent Hill administered the polygraph examination and thereafter took the appellant's confession. In this confession, the appellant stated:

> I would like to say to ... [C] that I'm sorry for what happened, I can't explain why it happened. This is something that I did that I didn't have any control over. I

VINSON BECAUSE THERE WAS A POSSIBILITY OF THE MISUSE OF A PHYSICIAN FOR A CRIMINAL INVESTIGATIVE PURPOSE. (CITATIONS OMITTED.)

II. A SENTENCE WHICH INCLUDES THREE YEARS CONFINEMENT IS INAPPROPRIATELY SEVERE, ESPECIALLY IN LIGHT OF THE FACT THAT THE GOVERNMENT, AT TRIAL, ONLY ARGUED FOR ONE YEAR CONFINEMENT. (CITATION OMITTED.)

III. THE GOVERNMENT FAILED TO PROVE APPELLANT GUILTY BEYOND A REASONABLE DOUBT BECAUSE NO WITNESS, INCLUDING THE VICTIM, POSITIVELY IDENTIFIED APPELLANT AS THE PERSON WHO COMMITTED THE SODOMY. (FOOTNOTE OMITTED.)

2. The appellant does not contest the admissibility of his confession to Hill in this appeal.

have never done this type of thing before and it will never happen again. I hope that we can still be friends. I can understand your reaction when you woke up to find me with my mouth on your penis. I'm sorry that this happened and if I could go back in time and prevent this from happening, I would. I am also sorry that I have put you and your wife through this.

Prosecution Exhibit 2 at 2.

Agent Hill testified that as the appellant confessed, the appellant became more sullen and depressed. He appeared upset and was hanging his head. When Harrison returned to transport the appellant back to the ship, Hill suggested to Harrison that he arrange for a psychiatric evaluation of the appellant because Hill recalled another case where a suspect displayed the same signs and ultimately committed suicide. At this time, the appellant apologized to Harrison for having lied to him.

Harrison brought the appellant to sick bay aboard the ship to see Lieutenant Commander [LCDR] Brinker, the ship's senior medical officer. Harrison and LCDR Brinker were friends and had discussed various ongoing investigations from time to time. They ate meals together in the wardroom, and they had discussed the appellant's case prior to the date of the polygraph examination.

Harrison told LCDR Brinker what had transpired regarding the appellant's polygraph and confession. He also expressed agent Hill's concern for the appellant's mental status. He asked the doctor to determine whether or not the appellant was a suicide risk. He denied requesting the doctor to ask any specific questions. Harrison left the appellant sitting in a chair outside LCDR Brinker's office.

LCDR Brinker was a department head aboard the ship and was in uniform at the time he met the appellant for the interview. Prior to speaking with him, he did not advise the appellant of his Article 31(b) rights even though he was aware of the pending charges. Article 31(b), UCMJ, 10 U.S.C. § 831(b). The interview lasted about 35 minutes. It began with the appellant expressing frustration about the investigation, and how NCIS persisted in spite of his denials. He began crying and LCDR Brinker continued to let the appellant talk. LCDR Brinker testified he was looking for signs of psychosis or schizophrenia. It was important for him to know what the appellant thought was real and what was not. He said it was unhealthy if there were a "true" denial and the incident did not take place. This could result in an inner conflict that needed resolution. He testified that the appellant was in a denial stage, and that if he was really guilty, therapeutically he needed to overcome that stage, accept what was done, and continue on with his life. For these reasons, about 20 minutes into the interview, and after the appellant had stopped crying, LCDR Brinker asked him, "Well, did you do it?" The appellant answered, "Yes, I did." LCDR Brinker said the reason he asked this question was for diagnostic purposes. He concluded that the appellant was not a suicide risk and released him for duty.

At trial, the defense attempted to suppress the appellant's admissions to agent Hill and LCDR Brinker. The military judge denied the request and entered his findings. He concluded that the statement to Hill was voluntary and that his free will was not overborne, citing the appellant's rank, his age of 29 years, and his 10 years of service. He found his waiver of his rights intelligent. He also admitted the statement to LCDR Brinker, concluding that it was given in the course of a reasonable medical proceeding. He found no overreaching by NCIS agents. He concluded his findings by stating, however, that the statement to LCDR Brinker, while for a medical purpose, raised "the possibility of the misuse of a physician for criminal investigative purposes under the guides [sic] of medical treatment, which should be a concern to all." Record at 147–48.

*Discussion*

Article 31(b) provides:

No person subject to this chapter may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is

accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

■ The purpose behind this provision is to avoid impairment of the constitutional guarantee against compulsory self-incrimination in the military setting. *United States v. Gibson,* 3 C.M.A. 746, 14 C.M.R. 164, 1954 WL 2109 (1954). In certain situations, the effect of superiority of rank or official position upon one subject to military law may lead to subtle pressures to respond to inquiry. *United States v. Duga,* 10 M.J. 206 (C.M.A.1981); *United States v. Armstrong,* 9 M.J. 374 (C.M.A.1980).

In this appeal, the appellant challenges the admission into evidence of the statement to LCDR Brinker. This officer was a person subject to the Code who suspected the appellant of an offense. The lead case in this area of the law is *United States v. Fisher,* 21 C.M.A. 223, 44 C.M.R. 277, 1972 WL 14092 (1972). In *Fisher,* the accused was brought to the emergency room and intensive care unit of an Army hospital. He suffered from respiratory depression and was in danger of serious physical consequences. The Court found that the questions asked by the Army doctor were necessary for treatment and diagnostic purposes and, citing *United States v. Baker,* 11 C.M.A. 313, 29 C.M.R. 129, 1960 WL 4471 (1960) and *United States v. Malumphy,* 12 C.M.A. 639, 31 C.M.R. 225, 1962 WL 4399 (1962), held:

> A medical doctor who questions an individual solely to obtain information upon which to predicate a diagnosis, so that he can prescribe appropriate medical treatment or care for the individual, is not performing an investigative or disciplinary function; neither is he engaged in perfecting a criminal case against the individual. His questioning of the accused is not, therefore, within the reach of Article 31.

44 C.M.R. at 279. This principle was recently reaffirmed in *United States v. Raymond,* 38 M.J. 136, 140 (C.M.A.1993), which involved a statement made to a psychiatric social worker. *Cf. United States v. Moreno,* 36 M.J. 107 (C.M.A.1992) (mental health worker's inquiry was not so merged with military

law enforcement as to require Article 31(b) warnings); *United States v. Moore,* 32 M.J. 56 (C.M.A.1991) (psychiatric nurse at a military hospital not required to give Article 31(b) warnings to child sexual abuse suspect). In *Raymond,* the Court stated "[T]here is no historical duty of health professionals engaged in treatment to warn based on the purpose behind Article 31(b)." 38 M.J. at 140.

■ We believe that although the case at bar involves a closer question than the cases cited above due to LCDR Brinker's superior military status, the location of the interview aboard ship, LCDR Brinker's close friendship with agent Harrison, and the fact that the appellant did not seek out the doctor for treatment. Nevertheless, we find that the inquiry did not merge with the law enforcement investigation because it was conducted solely for diagnostic and psychiatric care purposes. LCDR Brinker was not acting as the *alter ego* of the NCIS. From our review of the record, it was highly unlikely that LCDR Brinker was acting as a law enforcement agent because the NCIS had just obtained a valid confession from the appellant. There was no investigative or prosecutorial need for any further admissions. Harrison did not request LCDR Brinker to ask any questions concerning the incident, but only to determine whether or not the appellant was a suicide risk. Moreover, LCDR Brinker's testimony concerning the need for progression in mental health patients to overcome the denial stage convinces us that his question "Well, did you do it?" was motivated for non-law enforcement reasons and to help the appellant psychiatrically through what must have been a difficult period. We therefore agree with the ruling of the military judge not to suppress the appellant's statement to LCDR Brinker.

■ Even if the admission of the statement to LCDR Brinker were error, we would find it harmless beyond a reasonable doubt. *United States v. Palacios,* 37 M.J. 366 (C.M.A.1993); *see also United States v. Shepard,* 38 M.J. 408 (C.M.A.1993); *United States v. Miller,* 36 M.J. 124 (C.M.A.1992). There was ample other evidence to convict the appellant in this case. Airman [C]'s tes-

timony that his assailant was a short black male described the appellant because he was the only one in the residence the night of the incident who fit that description. In our view, this evidence alone would have been legally and factually sufficient to have convicted him. But added to it was the appellant's valid confession to NCIS agent Hill following the polygraph examination, the appellant's emotional display, and his subsequent apology to Harrison for having lied to him. The additional admission to LCDR Brinker, therefore, did not contribute to the guilty finding in this case.

For the above-stated reasons, we also find no merit in the third assignment of error. We are satisfied legally and factually beyond a reasonable doubt of the appellant's guilt to forcible sodomy. *United States v. Turner*, 25 M.J. 324 (C.M.A.1987). We also specifically find the sentence in this case is not inappropriately severe.

### Decision

Accordingly, the findings and sentence, as approved on review below, are affirmed.

Senior Judge MOLLISON and Judge CLARK concur.