UNITED STATES, Appellee

v.

Joey D. BOWERMAN, Private First Class, U.S. Army, Appellant.

No. 68,393.

CMR No. 9101690.

U.S. Court of Military Appeals.

Argued Dec. 1, 1993.

Decided May 31, 1994.

Appellant: *Captain Christopher W. Royer* (argued); *Lieutenant Colonel James H. Weise* and *Major James M. Heaton* (on brief); *Colonel Stephen D. Smith* and *Captain Edward T. Keable.*

Appellee: *Captain Joel B. Miller* (argued); *Colonel Dayton M. Cramer, Lieutenant Colonel Joseph A. Russelburg, Major Joseph C. Swetnam, Captain Robert J. Walters* (on brief); *Captain Gregory T. Baldwin.*

*Opinion of the Court*

GIERKE, Judge:

A general court-martial composed of officer members convicted appellant, contrary to his pleas, of maiming his 4-week-old son, in violation of Article 124, Uniform Code of Military Justice, 10 USC § 924. The approved sentence provides for a dishonorable discharge, confinement for 6 years, total forfeitures, and reduction to the lowest enlisted grade.

The Court of Military Review affirmed the findings and sentence without opinion. We granted review of the following issue personally raised by appellant:

> WHETHER DR. BELL, A KEY WITNESS FOR THE GOVERNMENT, ILLEGALLY INTERVIEWED PFC BOWERMAN BY NOT FIRST INFORMING HIM OF HIS ARTICLE 31(b) RIGHTS.

On the evening of November 13, 1990, appellant brought his 4-week-old son to the William Beaumont Army Medical Center, Fort Bliss, Texas. The infant was admitted as a "full code" with no heart or respiratory activity.

At issue is appellant's conversation on the morning of November 14 with Major Valerie A. Bell, M.D., the supervising pediatrician. Appellant contends that Major Bell, who was also the medical advisor to the Family Advocacy Case Management Team (FACMT), suspected appellant of abusing his child and was seeking information to support disciplinary action rather than questioning him to obtain a medical history of his baby for purposes of medical diagnosis. Final Brief at 3 and 4. The defense made a timely motion to

suppress statements made by appellant to Major Bell. The military judge denied the motion, giving rise to the granted issue.

When Major Bell initially examined the infant, he "was trying to die." He "was having a very hard time breathing, he was seizing, he was basically going down the tubes very quickly." Major Bell had noticed "pretty fresh bruises" on the infant's nose, eyes, chin, and right shoulder blade. The infant was unconscious.

Although Major Bell considered child abuse as a possible diagnosis, the doctors who had initially treated the infant in the emergency room told her that they believed appellant's explanation of how the bruising had occurred, i.e., that appellant had the infant in bed with him and had accidentally rolled over onto him. The other doctors told Major Bell that they thought the baby had choked on his bottle. The doctors "felt comfortable with the father" and believed that he had been "very up front with them and it was the truth." Major Bell's observation of the bruises did not cause her to suspect any broken bones at that time.

Although the other doctors, all of whom were residents and interns, had already taken a medical history from appellant, Major Bell felt that, as a supervising pediatrician, she had an obligation "to make sure the interns and residents have taken an accurate medical history." She was aware of the requirement to "read rights if we suspected the person we were speaking to at that time of child abuse." At the point she began talking to appellant, she was considering "a lot of reasons" for the infant's condition. She explained:

> It could be a severe infection, it could be a metabolic problem, it could be a birth defect to his heart, a birth defect of his blood system, he could have had a near SIDS [sudden infant death syndrome], he could have choked on his formula, there's an enormous amount of things. It could be trauma, suffocation, poisonings.

When trial counsel then asked, "[W]hich one of those possible explanations was top on your list?," Major Bell responded:

> I would say that I had to go on the basis of the two prior physicians' assessment, and they felt very comfortable that it was trauma and they felt it was a near SIDS or aspiration of [sic] choking on the formula.

Trial counsel asked Major Bell whether she questioned appellant "in your capacity as a supervising staff pediatrician, trying to save a dying baby or in your capacity as a FACMT representative trying to pursue a criminal investigation." She responded, "The first." When asked whether she suspected appellant of a crime when she "first began to question" him, she responded, "No. I had no reason to."

Responding to questions by trial counsel, Major Bell described her interview of appellant regarding the cause of the injuries as follows:

A: He said basically he had been taking care of his baby, his wife had left him several days before, and he was taking care of the child and that he had given him a bottle the night of admission and left him for a couple of minutes, he came back and found the baby limp, and he had given him mouth-to-mouth resuscitation, thought he felt a pulse and called for help.

Q: That's all he told you?

A: About that. Then I said, "Did anything happen to him before that?" He said, "No." I said, "How did he get the bruises on his face?" He said, "Well, I was holding him and he fell out of my arms." I said, "When?" He said, "Oh, I don't know, maybe Sunday." I said, "What time Sunday?" He said, "I don't remember."

* * *

Q: After he had said that the baby had dropped, then what happened?

A: I asked him what day, what time, and he didn't really know, he said, "Maybe Sunday. I don't know what time." I said, "How did he fall?" Four week old babies, you know, they can't fall. "How did he fall?" He said, "Well, I was holding him and I don't know how he fell, he just fell." I said, "Well, what did he fall on?" He said, "The couch cushion." So I said, "So

he didn't fall on the floor?" He said, "No, he didn't fall on the floor." I said, "Okay."

\* \* \*

Q: Okay. And then what happened after that?

A: And he said, "No, that's how it happened." I said, "Did anybody else take care of the baby yesterday?" And he said, "Yeah, I had him at the baby-sitter until noon yesterday," and then I was with him alone. And I said, "Well, your baby is in there fighting for his life and what you've told me doesn't explain to me why he's fighting for his life. There's something else that happened, we need to know it, you need to help us help your baby," and I said, "that's all."

At that point Major Bell terminated the interview. She explained, "I was very suspicious at that time, but I didn't ask him any further questions." \*

After terminating her conversation with appellant, Major Bell ordered a battery of tests and consultations. As she explained:

We did lots of laboratory tests looking for an infection, looking for poisoning, looking for metabolic abnormalities. We did X-rays, we did CT Scans, we did brain wave tests, we did consultations.

When the diagnosis was complete, Major Bell concluded that the infant "was violently and repeatedly shaken and then slammed, causing his brain to be ripped from his skull, his eyes to be torn, the retina to be torn apart, his ribs to be crushed, and to become close to the brink of death...." The infant lapsed into a "chronic vegetative state" with "no hope of recovery."

Appellant gave a different account of his conversation with Major Bell, testifying as follows:

The first thing I remember is Doctor Baker and Doctor Rodriguez were in Class B's and their coat and [Major Bell] was sitting there in BDU's [battle dress uniform]. I sat down and she asked me if I had shaken my son. That was the very first thing she asked.

The military judge denied the motion to suppress the evidence of appellant's conversation with Major Bell. He stated:

I'm satisfied that at the time Doctor Bell was questioning the accused, she didn't suspect him of committing an offense. And I'm also satisfied that a reasonable pediatrician in the same situation, would not necessarily have suspected the accused of having committed an offense. Doctor Bell, at that time, was not conducting an investigation relating to disciplinary actions or law enforcement, rather she was acting as a treating physician obtaining information to properly treat her patient.

■ We hold that the military judge did not err in denying the motion to suppress. The record amply supports the military judge's finding that Major Bell's questioning of appellant, in her role as supervising pediatrician, was for the purpose of medical diagnosis of a seriously injured baby who was "going down the tubes very quickly." Under those circumstances, the warnings in Article 31(b), UCMJ, 10 USC § 831(b), were not required. See *United States v. Fisher*, 21 USCMA 223, 225, 44 CMR 277, 279 (1972) (questioning by medical doctor for diagnosis not "within the reach of Article 31"). See also *United States v. Moore*, 32 MJ 56, 60 (CMA 1991) (questioning by nurse for medical purpose outside "scope of Article 31"); *United States v. Loukas*, 29 MJ 385, 387, 389 (CMA 1990) (questioning by crew chief for operational rather than law enforcement or disciplinary reasons outside scope of Article 31).

■ Even if Major Bell thought that child abuse was a "distinct possibility," her questioning of appellant "to ascertain the facts for protective measures and curative purposes" did not violate Article 31. *United States v. Baker*, 11 USCMA 313, 317, 29 CMR 129, 133 (1960). When appellant's vague, contradictory, and medically implausible explanations for the baby's injuries caused her to suspect child abuse, she terminated the inter-

---

\* Although Major Bell did not articulate the basis of her suspicion during the suppression hearing, she later testified that appellant's explanation for the infant's injuries were medically "implausi-

ble." She also found it suspicious that appellant was so "vague." She explained: "Most parents ... know exactly how and when their child was hurt ... especially a four-week-old baby...."

view. Major Bell's duty as medical advisor to the Family Advocacy Case Management Team and her duty to report suspected child abuse did not transform her into a criminal investigator. *See United States v. Raymond,* 38 MJ 136 (CMA 1993).

The decision of the United States Army Court of Military Review is affirmed.

Judges COX, CRAWFORD, and WISS concur.

SULLIVAN, Chief Judge (concurring):

I can affirm this case on the basis of this Court's decisions in *United States v. Moore,* 32 MJ 56 (CMA 1991), and *United States v. Loukas,* 29 MJ 385 (CMA 1990). As for my dissent in *United States v. Raymond,* 38 MJ 136, 144 (CMA 1993), I simply note that it has not yet persuaded a majority of this Court.