*99 CRAWFORD, Chief Judge
(concurring in part and dissenting in part):

Introduction

To reach its desired result on the key issue, the majority concludes that all the evidence of Appellant’s prior abuse of Nicole was inadmissible under Military Rule of Evidence 404(b) [hereinafter M.R.E.]. Yet Huddleston v. United States, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), and Estelle v. McGuire, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), make clear that M.R.E. 404(b) is a rule of inclusion, not a rule of exclusion, and that under this rule, the evidence of Appellant’s prior abuse of Nicole was admissible.
In Huddleston, the Court noted:
Article IV of the Rules of Evidence deals with the relevancy of evidence. Rules 401 and 402 establish the broad principle that relevant evidence — evidence that makes the existence of any fact at issue more or less probable — is admissible unless the Rules provide otherwise.
485 U.S. at 687, 485 U.S. 681. The Court also quoted the Rules Advisory Committee, which
specifically declined to offer any “mechanical solution” to the admission of evidence under 404(b). Rather, the Committee indicated that the trial court should assess such evidence under the usual rules for admissibility: “The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other factors appropriate for making decisions of this kind under Rule 403.”
Id. at 688, 108 S.Ct. 1496 (citations omitted). The majority, however, ignores and distorts Huddleston, as well as McGuire, with the end result that future child abuse prosecutions may now be more difficult in the military justice system than in the civilian criminal justice system.
Even so, I agree with the majority that it was error for Dr. Stuemky to testify — eontrary to the military judge’s express instructions — that he believed Appellant killed Nicole. Likewise, I also agree that to the extent Ms. Amlin similarly testified, that too was error.[1] See United States v. Douglas, 57 M.J. 270, 271-72 (C.A.A.F.2002)(unclear if military judge’s redaction order was followed by counsel). Unlike the majority, however, I conclude these errors did not substantially influence the members’ findings of guilty in light of: (1) the undisputed facts surrounding Nicole’s death; (2) the admissible portions of Dr. Stuemky’s and other expert testimony concerning the cause of Nicole’s death; (3) the admissible evidence of Appellant’s prior abuse of Nicole and subsequent abuse of Jasmine; (4) Appellant’s admissions to Ms. Amlin and his resulting loss of credibility; and (5) the military judge’s curative instructions. See United States v. Armstrong, 53 M.J. 76, 81 (C.A.A.F.2000)(expert testimony that an accused committed charged acts of abuse is error tested for harmlessness); United States v. Charley, 189 F.3d 1251 (10th Cir.l999)(harmless error when several experts testified that sexual abuse actually occurred or premised their testimony on fact of actual abuse).
For these reasons, I respectfully dissent.

Undisputed Facts

At trial and on appeal, the Government and Appellant agreed on every fact surrounding Nicole’s death — except one. Specifically, they both agreed that Appellant retrieved Nicole from her crib and brought her into the living room. They both agreed Appellant’s wife was asleep in her bedroom at the time. They both agreed Appellant laid Nicole across his lap as he sat on the sofa. They both agreed she was alive at the time. They both agreed no one else was in the room besides Nicole and Appellant. And they both agreed that Nicole passed from life to death as she laid there in Appellant’s lap.
The only thing they disagreed on was whether Nicole died innocently of natural causes as she laid in Appellant’s lap, or *100 whether she died maliciously through suffocation as she laid in Appellant’s lap. Either way, however, she died at the hands of Appellant, and that was not, and is not, in dispute.

Dr. Stuemky’s Inadmissible Testimony

Dr. Stuemky was asked by the prosecutor: “Did you come to any conclusion with regard to your review of Nicole’s death[.]” In response, and contrary to express instructions from the prosecutor at the request of the military judge, Dr. Stuemky testified that “this was a homicide death ... a physical abuse death. And furthermore, I felt that the perpetrator was the father.”
The express instructions he received were that he could opine only that the death was “consistent with child abuse,” and had he limited himself in that way, there would have been nothing objectionable about his testimony. See Charley, 189 F.3d at 1264 (no abuse of discretion allowing expert to “express an opinion that the evidence is consistent or inconsistent with the victim’s allegations of sexual abuse”); United States v. Birdsall, 47 M.J. 404, 409 (C.A.A.F.1998)(quoting United States v. Whitted, 11 F.3d 782, 785 (8th Cir. 1993))(“A doctor can also summarize the medical evidence and express an opinion that the evidence is consistent or inconsistent with the victim’s allegations of sexual abuse.”).
Before this Court, Appellant argues in Granted Issues I and II that he was materially prejudiced by Dr. Stuemky’s improper testimony, and that the military judge erred in not granting the requested mistrial. The majority agrees. I, however, do not.

Discussion

As a starting point, I note that Dr. Stuemky’s improper testimony consisted of two parts. The first was a conclusion that in his opinion, “this was a homicide death ... a physical abuse death.” The second was a conclusion that “the perpetrator was the father.” Importantly, however, given the undisputed facts in this case, the second part of Dr. Stuemky’s testimony (that Appellant was the killer) was superfluous because it added nothing to what he already said with the first part of his improper testimony (that the death was a homicide). Everyone agreed, including the defense, that Nicole died while in Appellant’s hands and in the presence of no one else. Thus, identity was never an issue, and neither was the following, undisputed reality: If Nicole’s death was a homicide, it was Appellant who killed her.
That being the case, once Dr. Stuemky testified that Nicole’s death was a homicide, all the damage (if any) was done, and no additional prejudice could result from his subsequent testimony that Appellant was the one who killed her. That testimony was nothing more than a redundancy, stating merely the sole and obvious conclusion that flowed from the undisputed facts in this case. Thus, it appears that it is a majority of this Court, not the military judge or the court below, that “misapprehend[s] the prejudicial impact of ... [the] inadmissible testimony” by treating the issues of homicide and identity as co-equal in this case. 59 M.J. at 91-92. They are not co-equal. They are one and the same.
Properly narrowed, Granted Issue I asks only whether Dr. Stuemky’s single, impermissible statement that Nicole’s death was a homicide — as opposed to the permissible statement that her death was consistent with child abuse — substantially influenced the members’ finding of guilty. In light of the other evidence in this case, Appellant’s complete lack of credibility, and the military judge’s curative instructions, I conclude that it did not, and that as a result, the military judge did not abuse his discretion by not granting a mistrial (Granted Issue II).

Dr. Stuemky’s and Other Admissible Expert Testimony on the Cause of Death

As a member of Oklahoma’s Child Death Review Board, Dr. Stuemky performed a thorough review of the circumstances surrounding Nicole’s death. That review led him to the following conclusions, to which he testified at trial: (1) there was no “biological, anatomical, or toxicological” cause of Nicole’s death; (2) Nicole was “way beyond” the age of Sudden Infant Death Syndrome (SIDS); (3) as a result, her death was not a “natural *101 cause” death; and (4) her death was “consistent with suffocation.”
Specifically, Dr. Stuemky testified that SIDS is “defined by the National Institutes of Health [ (NIH) ] in this country as simply a sudden, unexplained death in an infant under 12 months of age in whom an autopsy has in fact been performed, and no other causes or abnormalities are noted[.]” He further testified as follows regarding SIDS:
Twelve months — the absolute outer limits of 12 months was endorsed by the NIH. SIDS is primarily an event that occurs in infants under 6 months of age. Ninety percent of SIDS deaths are under 6 months of age, with the peak time of SIDS deaths between 2-4 months of age. SIDS is, very interestingly enough, uncommon in the first month of life. It’s not until after the first month of life that one begins to see SIDS deaths. By 6 months of age, 90 percent of all SIDS deaths have occurred that you’re going to see. Indeed, many people have felt that one shouldn’t call a SIDS death beyond 6 months of age. But the NIH finally felt that the consensus should be that the absolute, outer time limit for labeling a SIDS death was 12 months of age.
(Emphasis added.) Nicole, of course, was 14 months old when she died, which Dr. Stuemky testified was “very significant,” because in the absence of a biological, anatomical, toxicological, or other identifiable cause of death, “we would not consider this a natural cause of death.... And our concern is that it’s most likely consistent with suffocation.”
Dr. Stuemky then made the following observation, which every member of Appellant’s court-martial must also have known through common sense and common experience: “Children just don’t die suddenly laying on a parent’s lap.” Certainly a reasonable and experienced member of society knows that a healthy 14-month-old child— “way beyond” the age of SIDS — does not just die without a cause. That is why I conclude on this record that notwithstanding Dr. Stuemky’s inadmissible testimony, the members would still have convicted Appellant based on the strength of Dr. Stuemky’s admissible testimony, and the other admissible evidence and testimony.
Part of that other evidence and testimony came from Dr. Balding, the medical expert who performed the autopsy on Nicole, which he described as entailing the “opening of the body with surgical incisions, including the head and examination of the brain and all of the major internal organs. Again, this is done to look for evidence of injury or disease. At this time also, we take specimens such as blood, urine, or any other bodily fluids which can be used for later drug analysis; that sort of thing. Also at this time, postage stamp-sized pieces of the major organs; these are then processed and examined under the microscope at a later time.” Based on this autopsy, Dr. Balding testified Nicole’s heart, lungs, kidneys, and thyroid were all “normal,” and that “as far as the internal organs go, there was no evidence of injury or natural disease.” He also testified that Nicole’s brain was “normal” and “there was no evidence of injury or disease to the brain.”
As for the toxicological screen that was conducted, he testified that “it was essentially negative, except there was brompheniramine, which is an over-the-counter cold medication [Dimetapp]. It was a very small amount that was present____ [I]t was negative in terms of having any relation to causing the death.” Dr. Balding also testified there was no anatomical cause of death and he “could find no cause of death of Nicole,” but that the autopsy results were consistent with suffocation.

Appellant’s Prior Abuse of Nicole and Subsequent Abuse of Jasmine

Death by suffocation as opposed to SIDS was also consistent with Appellant’s prior and subsequent abuse of his children, which was “proximate in time” to Nicole’s death and, along with the other evidence in this case, “established that [Appellant] had both the inclination and the opportunity” to seriously harm Nicole. See Charley, 189 F.3d at 1271 (discussing relevance of defendant’s pri- or abuse of victim).
It is here, however, that several of the other Granted Issues dovetail, because a *102 good deal of the evidence of these other instances of abuse came from statements Appellant made to medical and social work personnel — statements Appellant argues were inadmissible because (1) these people did not read him his rights before questioning or counseling him, and (2) he was coerced into making some of the statements. I therefore address these arguments first, before further addressing the relevance and admissibility of Appellant’s prior abuse of Nicole and subsequent abuse of Jasmine.

Questioning by Captain (CPT) Tremaine

On October 13, 1995, Appellant’s nine-month-old daughter Jasmine was referred to CPT Tremaine by Hawaii Child Protective Services for evaluation of a three-month-old burn located on her left inner thigh. The evaluation was part of a Suspected Child Abuse and Neglect (SCAN) work-up, and included CPT Tremaine questioning both Appellant and his wife about the burn to help him determine whether it resulted from an accidental or non-accidental cause. In addition, CPT Tremaine closely examined the burn and conducted many other medical tests over almost a week’s time in order to properly diagnose the cause of Jasmine’s injury.
Regarding the need for and importance of determining whether the cause of the burn was accidental or non-accidental, CPT Tremaine testified as follows:
Our main concern as the physician is — we are the physician of that child. It is our job to protect that child. So in establishing the diagnosis of non-accidental versus accidental trauma, we are, in essence, protecting that child from potential future events.
It has important bearing on the child. Children who are subject to non-accidental trauma are at greater risk for future episodes of non-accidental trauma. That has been proved over and over again. The only effective way to treat that is removal of the child from the house, or from the potential abusive situation.
CPT Tremaine also testified that questioning parents about the causes and extent of their children’s injuries was standard operating procedure, regardless of “whether it’s a diagnosis of alleged child sexual abuse, or some other injury or disease[.]”
Turning to CPT Tremaine’s actual questioning of Appellant, CPT Tremaine did not read Appellant his rights beforehand, but he did inform Appellant “[t]he purpose was for a SCAN work-up ... a ‘Suspected Child Abuse and Neglect’ work-up ... to establish a diagnosis and find out if there was accidental or non-accidental trauma done[.]” Moreover, although law enforcement officers in plain clothes arrived after CPT Tremaine began questioning Appellant, they only did so because as a matter of protocol, they were notified a SCAN work-up was underway; they never entered the room where CPT Tremaine and Appellant were; they never questioned Appellant; they never communicated with CPT Tremaine during the questioning; and they never gave CPT Tremaine questions to ask Appellant.
In these circumstances, Appellant agreed to answer CPT Tremaine’s questions, and the statements he provided were used against him at his court-martial over the defense’s objection. The specific content of those statements I discuss more fully infra. For now, all that is needed is to decide whether CPT Tremaine was required to read Appellant his rights under Article 31, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. § 831 (2000), before questioning him. Appellant argues in Granted Issue III that CPT Tremaine was so required, and that as a result, Appellant’s statements to him were inadmissible. Appellant is mistaken.

Article 31(b) Warnings

Article 31(b) provides:
No person subject to [the UCMJ] may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.
*103 The rationale behind Congress’s passage of Article 31(b) was recently discussed in United States v. Swift, 53 M.J. 439, 445 (C.A.A.F.2000), where we observed:
In the armed forces, a person learns from the outset of recruit training to respond promptly to the direct orders and the indirect expectations of superiors and others, such as military police, who are authorized to obtain official information. Failure to respond to direct orders can result in criminal offenses unknown in civilian life____
In such an environment, a question from a superior or investigator is likely to trigger a direct response without any consideration of the privilege against self-incrimination. The Article 31(b) warning requirement provides members of the armed forces with statutory assurance that the standard military requirement for a full and complete response to a superi- or’s inquiry does not apply in a situation when the privilege against self-incrimination may be invoked.
See also United States v. Harvey, 37 M.J. 140, 143 (C.M.A.1993).
Thus, although by its terms, Article 31 seems to apply to all questioning of suspects and accuseds by individuals subject to the UCMJ,[2] applying the rationale behind Article 31(b), our Court has held that “this statute requires warnings only when questioning is done during an official law-enforcement investigation or disciplinary inquiry.” United States v. Loukas, 29 M.J. 385, 387 (C.M.A. 1990). Consequently, many non-commanders and non-law enforcement personnel are not required to administer Article 31(b) warnings before questioning service-members. See, e.g., United States v. Raymond, 38 M.J. 136 (C.M.A.1993)(psychiatric social worker); United States v. Moreno, 36 M.J. 107 (C.M.A.1992)(state social worker); United States v. Pittman, 36 M.J. 404 (C.M.A.1993)(section leader/friend).
As a result, there is a long-standing principle that questioning by medical personnel for the sole purpose of diagnosis and treatment, even if a crime is suspected, does not need to be preceded by Article 31 warnings. See United States v. Bowerman, 39 M.J. 219, 221 (C.M.A.1994)(although doctor suspected child abuse, questioning suspected parent without Article 31 warnings was permissible “to ascertain the facts for protective measures and curative purposes”); United States v. Fisher, 21 C.M.A. 223, 225, 44 C.M.R. 277, 279 (1972) (questioning by doctor for diagnosis not “within the reach of Article 31”).
In Bowerman, “a seriously injured baby ... Svas going down the tubes very quickly1 ” when the questioning took place. In Fisher, the accused “was in immediate danger of suffering serious physical consequences” when he was questioned. Thus, in both cases, timing was important. Absent immediate knowledge of the cause of the injuries, effective treatment could be compromised.
In this case, there was no existing injury threatening Jasmine at the time CPT Tremaine questioned Appellant. Rather, the questioning took place as part of an evaluation of a three-month old burn. Nonetheless, rights warnings were still not required, because as the facts set forth above make abundantly clear, CPT Tremaine was not acting in a law enforcement or disciplinary capacity. To the contrary, he was acting solely on behalf of Jasmine, and solely in her best medical interests.
Although there was no longer a threat to Jasmine from the burn itself, the cause of the burn still had to be determined so that, if necessary, CPT Tremaine and other medical and social work professionals could take the steps required to effectively prevent Jasmine from suffering the same type of physical injury in the future. Moreover, as CPT Tremaine indicated at trial, such a procedure was nothing new. Physicians always seek to ascertain the cause of an injury in order to prevent similar injury in the future; and they always seek that information from parents or guardians when injured children have not yet learned to speak, as was the case with nine-month old Jasmine.
Thus, CPT Tremaine’s questioning of Appellant was all about Jasmine and her medi *104 cal well-being (Bowerman’s “protective measures”), and nothing about law enforcement or disciplinary action against Appellant (which had not even begun). The fact that the suspected cause of Jasmine’s injury was criminal abuse as opposed to some accidental or natural occurrence (diagnosis), and the fact that the best way to prevent similar injury in the future was to remove Jasmine from the home as opposed to administer medicines or physical therapy (treatment), does not negate that dispositive fact that in this case.
That said, CPT Tremaine was not required to read Appellant his rights before questioning him about the cause of Jasmine’s injury. This is so regardless of CPT Tremaine’s duty to advise Child Protective Services (CPS) of the results of Jasmine’s SCAN evaluation, and regardless of his duty to report suspected child abuse to criminal authorities. Bowerman, 39 M.J. at 222 (citing Raymond, 38 M.J. 136)(sueh duties “[do] not transform [a medical doctor] into a criminal investigator.”).

Counseling With Ms. Amlin

When his evaluation was complete, CPT Tremaine determined that Jasmine’s bum was a “classic branding injury” and was not accidental. As a result, CPS removed Jasmine from Appellant’s home. About a year later, though, she was returned to the home, with the condition that Appellant move out and not visit the home while Jasmine was present, and the further condition that Appellant successfully complete counseling before returning permanently to the home. All this took place in Hawaii.
Complying with the CPS order, Appellant moved out of the house. However, sometime thereafter, he was transferred to Fort Drum, New York, while his wife and Jasmine remained in Hawaii. Once at Fort Drum, Appellant went to the Family Advocacy Program seeking the counseling he needed to move back in with his family. In due course, his case was randomly assigned to a civilian social worker named Ms. Amlin. Prior to meeting with Appellant, Ms. Amlin reviewed a letter from the Hawaiian authorities that set forth the nature of the counseling Appellant had to receive in order to rejoin his family. Specifically, Appellant had “to take ownership of the abuse [of Jasmine], to take responsibility for the abuse, to develop an empathy and understanding of the enormity of the consequences to the child — how it would impact the child psychologically.”
Ms. Amlin met with Appellant four times, and although she never read him his rights before these sessions, she did inform him of her duty to disclose child abuse to both the military and civilian authorities. Eventually, Ms. Amlin did contact the authorities and inform them about instances of Appellant abusing his children. However, at no time during her sessions with Appellant did she take any direction from any law enforcement authority. Moreover, no law enforcement authority attended any of the sessions or directed that those sessions take place. Everything that took place during those sessions took place solely within the social work community, and in accordance with that community’s standard operating procedures.
During his counseling sessions with Ms. Amlin, Appellant made statements that were used against him at his court-martial over the defense’s objection. Once again, the specific content of those statements is not yet germane and will be discussed in detail later. For now, it is necessary only to decide whether Ms. Amlin was required to read Appellant his rights before the therapy sessions. Appellant argues in Granted Issue IV that she was and that, as a result, his statements to her were inadmissible. Appellant further argues that even if Ms. Amlin was not required to read him his rights, his statements to her were still inadmissible because they were coerced. Appellant is wrong.

Article 31(b) Warnings

Although by its terms, Article 31(b) applies only to someone “subject to the [UCMJ],” consistent with the rationale behind its passage, it also applies to a civilian investigator “(1) [w]hen the scope and character of the cooperative efforts demonstrate that the two investigations merged into an indivisible entity,” and “(2) when the civilian investigator acts in furtherance of any military investigation, or in any sense as an instrument of the *105 military[.]" United States v. Penn, 18 C.M.A. 194, 199, 39 C.M.R. 194, 199, (1969)(internal quotations omitted). See M.R.E. 305(d). However, just as with military medical personnel, civilian medical personnel do not have to give Article 31 warnings to patients when they are acting “only in a legitimate medical capacity” and not “directly or indirectly in any law enforcement or disciplinary capacity.” United States v. Moore, 32 M.J. 56, 60 (C.M.A.1991).
As the facts in this case make clear, Ms. Amlin was not acting in furtherance of any military or law enforcement investigation, or as an accessory to any law enforcement effort. Her role was solely that of a licensed social worker trying to carry out the treatment plan mandated for Appellant. As a result, Ms. Amlin was not required to give appellant Article 31 warnings before the counseling sessions. See Moreno, 36 M.J. at 114-17 (no Article 31 warnings required when civilian social worker who knew case was substantiated and “turned over to the prosecutor’s office” conducted counseling sessions with accused and urged him to admit his crimes as first step to recovery); see also Raymond, 38 M.J. at 138-40; Moore, 32 M.J. at 60-61.

Army Regulation 608-18

Appellant argues that Dep’t of the Army Regulation 608-18, The Army Family Advocacy Program (Sept. 1,1995) [hereinafter AR 608-18], required Ms. Amlin to administer Article 31 warnings before her counseling sessions with Appellant. Appellant is incorrect. In Raymond, this Court concluded that AR 608-18
is a personnel regulation, not a law enforcement regulation____ It is not a law enforcement program; it is a community services program. The cooperative effort required by the regulation [e.g. — the reporting requirement] does not render every member of the military community a criminal investigator or investigative agent but, rather, merely ensures that the competing interests of various segments of the military community accommodate each other as much as possible.
38 M.J. at 138-39. As a result, the Raymond Court held AR 608-18 did not require a social worker similar to Ms. Amlin to administer Article 31 warnings before counseling sessions similar to those in Appellant’s case.
The version of AR 608-18 in effect at the time Raymond was decided is different from the version applicable in Appellant’s case, but not significantly. Both have reporting requirements, and both have the following language:
Except when not required by law ... soldiers suspected of spouse or child abuse will be advised of their rights under Article 31, UCMJ, and of them right to counsel prior to being questioned about abuse offenses. Soldiers who are self-referrals will also be advised of them rights under Article 31, UCMJ, and of their right to counsel prior to being questioned about abuse offenses.
AR 608-18 at para. 3-21d (emphasis added); AR 608-18 at para. 3-24d (Sept. 18, 1987). Thus, there is no reason to construe the current version of AR 608-18 any differently than in Raymond as it relates to the requirement of a rights warning before therapeutic counseling sessions unrelated to law enforcement. Such warnings are “not required by law,” because this Court has consistently said they are not. See Bowerman, 39 M.J. at 221; Raymond, 38 M.J. at 138-39; Moreno, 36 M.J. at 117; Fisher, 21 C.M.A. at 225, 44 C.M.R. at 279.

Voluntariness

Appellant also argues that regardless of whether Ms. Amlin should have read him his rights, his admissions to her were involuntary and, therefore, inadmissible because he was required to attend those sessions and accept responsibility for the injuries to Jasmine before he could be reunited with his family. See Arizona v. Fulminante, 499 U.S. 279, 285-87, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)(totality of circumstances determines voluntariness of confession). This argument holds no sway in light of this Court’s clear precedent to the contrary.
*106 In Moreno, the appellant was faced with a choice: he could participate in counseling in an attempt to keep his family together, with the result that anything he said might be used against him at court-martial, or he could refuse to participate in the counseling and risk losing his children. He opted for the former, and the foreseeable result came to pass — he was prosecuted and his statements were used against him. On appeal, he argued the “choice” he faced rendered his statements during counseling involuntary. This Court disagreed and said:
It was something of a dilemma to be sure, but it was a dilemma of his own causing. When people abuse children in this society, two distinct processes are triggered. One is the criminal process, which focuses on the proper way to deal with the perpetrator. The other is the child-protective process, which focuses on the preservation of and best interests of the child-victim.
36 M.J. at 112. The Court then concluded that nothing was done within the child-protective process to make the appellant’s statements involuntary (i.e., no “improper threats, inducements, or promises”).
Similarly, in United States v. Ellis, 57 M.J. 375 (C.A.A.F.2002), detectives informed the appellant there was probable cause to arrest both him and his wife, and that if both were arrested, their children would probably be removed from them and placed in foster care. Thereafter, the appellant indicated he wanted to talk, waived his rights, and confessed to child abuse crimes. Once again, the appellant argued his confession was involuntary because it was motivated by a desire to not lose his family. Once again, however, this Court disagreed and said:
While the detectives’ advice to appellant concerning removing the remaining children from the home may have contributed to his confession, the mere existence of a causal connection does not transform appellant’s otherwise voluntary confession into an involuntary one.
Id. at 379 (citing Colorado v. Connelly, 479 U.S. 157, 164 n. 2, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)).
For the same reasons, Appellant’s statements and admissions to Ms. Amlin were not constitutionally involuntary. The fact that Appellant was required “to take ownership of the abuse [of Jasmine], to take responsibility for the abuse,” in order to get Jasmine back does not lead to a different result. Factually, this is not that different from Moreno, where “[a]s a ‘first step’ in his recovery, [the therapist] urged [the] appellant to admit his conduct,” which the appellant did, and which helped secure his conviction. 36 M.J. at 115. Legally too, then, the result in Appellant’s case is the same — constitutionally voluntary statements, admissible against him as evidence of his other abuse of Nicole and Jasmine.

Appellant’s Prior Abuse of Nicole and Subsequent Abuse of Jasmine

Having disposed of the underlying Article 31 and voluntariness issues, I now return to the relevance and admissibility of Appellant’s prior abuse of Nicole and subsequent abuse of Jasmine. I deal first with his abuse of Jasmine by intentionally burning her, and I do so because (1) Appellant’s conviction for that offense is completely insulated from any prejudice that possibly could flow from Dr. Stuemky’s improper testimony, and (2) Appellant’s confessed reason for committing that offense strengthens the conclusion that his prior acts of abusing Nicole were relevant and admissible.

Jasmine’s Branding

Regarding the scarring on Jasmine’s inner thigh, CPT Tremaine (who evaluated the injury for purposes of the SCAN work-up) gave expert testimony as follows:
We saw a well-healed scar on ... her upper thigh that had essentially a branding pattern to it, potentially three different distinct areas.

It was a classic branding injury, where a hot object ... [is] placed against the body and held there for a period, rendering a very distinct pattern, which based on the healing and scarring patterns, was consistent unth three separate branding injuries.

*107 (Emphasis added.) This conclusion was confirmed by pictures of the burn, admitted as Prosecution Exhibit 3. Those pictures disclose quite clearly — in the words of CPT Tremaine — a “triangle” of scar tissue (i.e., “three separate branding injuries”) with “a veiy distinct border” surrounding a “central area” of “normal skin” that “wasn’t burned.” In other words, “a classic branding injury,” not an accidental burn from a lighter falling one time onto Jasmine’s thigh. See United States v. James, 55 M.J. 297, 301 (C.A.A.F.2001)(appellant’s admissions supported by pictures in the record).
More importantly, however, Appellant admitted that he intentionally burned Jasmine. CPT Tremaine testified that when he asked Appellant how Jasmine was burned, Appellant
reported that Jasmine had been laid down to sleep that night, and when he went in to look in on her, he noticed a centipede laying in her crib. He proceeded to obtain his lighter and to chase the centipede around the bed and try to burn the centipede. While he was doing that, he reported that he’d taken Jasmine into his wife’s — where his wife was, and his wife was in their bedroom. He went back, got Jasmine, went to the living room, reported lighting a cigarette and dropping the lighter on Jasmine’s leg.
Thereafter, Appellant repeated this lie to Ms. Amlin at the beginning of their counseling sessions, but after several additional sessions, he admitted intentionally burning Jasmine.
Ms. Amlin testified as follows in response to questions from the prosecution:
Q: During that first session, what did [Appellant] tell you about that burn?
A: Initially, he indicated that he was with the baby and he’d lit a cigarette, and had inadvertently dropped the lighter onto the child, causing the burn. I indicated that I felt that that probably wasn’t possible, considering the lighter would have to be fairly hot, and just lighting a cigarette would probably not cause that type of burn or injury.
Mr. Diaz then changed his account of the events and indicated that there’d been an insect of some sort in the crib, and he didn’t want it to bite the baby, so he was trying to [d]estroy the insect with the cigarette lighter, and while he was holding the baby and holding this lighter on this bug, he dropped it and burned the child.
Q: That was what [Appellant] told you diming the first session?
A: Yes.
Q: During the second session, did [Appellant] tell you that story again?
A: Initially, yes, he did. I confronted him that again [sic]; it didn’t seem like a plausible story. I recall asking him, “Why didn’t you just step on this insect? Why didn’t you hit it with something? Why didn’t you just lift the baby up and away from the insect?” It seemed like an unusual way to go about protecting the child from an insect bite. At that point, I asked him, ‘What does DHS think? Do they think you did this on purpose?” And he said, “They’d say I did it.” I said, “What would your wife’s parents say?” And he said, “They’d say I did it.” I then asked him what his parents would think about this, what would they say caused this accident, and he said, “They’d probably say I did it.” I then asked him, “What’s the likelihood that you did it? What percentage would you put on that you actually did this?” And he looked at me and said, “One hundred percent.” At that point, he started to tell me what had actually happened.
Q: Did you ask him how the injury to Jasmine occurred?
Yes, I did.
What was [Appellant’s] response?
He indicated that Mrs. Diaz was sleeping, it was late at night, he’d taken Jasmine from the crib. He said he was on the sofa watching television. He said he laid her down, heated the lighter up, got it hot and placed it on her thigh. When I asked him why he did that, he said, “I wanted to see what she would do. ”
(Emphasis added.)
The majority concludes that even Appellant’s conviction for burning Jasmine must be *108 set aside as tainted by the improper testimony in this case. Yet how the majority reaches this conclusion escapes me. Appellant voluntarily confessed to Ms. Amlin both this crime and his motive. Furthermore, the expert testimony of CPT Tremaine and the pictures of Jasmine’s scarred leg corroborated this confession, and showed Appellant steadfastly had lied quite implausibly about the cause of Jasmine’s injury.
In these circumstances, I conclude the improper testimony at this trial in no way affected the members’ finding of guilty to the aggravated assault of Jasmine. I further conclude that the strength of the evidence proving Appellant’s aggravated assault of Jasmine also made the evidence of Appellant’s prior abuse of Nicole relevant and admissible.

Nicole’s Burned Face and Other Injuries

About a year before Nicole’s death, when she was only several months old, she was taken to the hospital with second and third degree burns on her face. The intake worker at the hospital that night testified Nicole “had a burn on her face, on the left side, from just about her lip up to her hairline.” The intake worker also testified Nicole “had three small, round bruises just below the burn on the left side of her face.”
Nicole was treated by Dr. Oscar Falcon, who testified as follows regarding what he saw:
I saw a young child with 2nd and 3rd degree burns to the right — I’m sorry, to the left mid-face. The left eye, at that time, was swollen shut.... I also noted on the child that there were old bruises on the right cheek, and one on the right anterior chest.
As a result of this burn injury, two things took place. Ultimately, Nicole was removed from Appellant’s home and placed in foster care. Immediately, however, Dr. Stuemky also examined Nicole in his role as a member of the Child Protection Committee for Children’s Hospital of Oklahoma. Regarding Nicole’s injuries, he testified as follows:
This was a baby that had 2nd degree burns, these were bums that cause blisters and redness, about the face, particularly on the left side of the face.... It encompasses above the eye much of the left side of the forehead, down over the top, down the bridge of the nose, over most of the anteri- or surface of the nose, under the eye, and down over the cheek and left side of the upper lip____ [There were also] several bruises present on her cheek, the left side of her cheek, and ... an older bruise on her chest.
Dr. Stuemky also testified that X-rays of Nicole revealed older, healing rib fractures on both sides of Nicole’s body. He testified it was “medically impossible for these fractures to have occurred at the time of birth. These fractures happened after birth.” Finally, he testified as follows regarding Nicole’s rib injuries:
Really, all the bones of infants and small children are very pliable. They bend easier then they break____ [T]he only cause of rib fractures in infants and small children, particularly posterior rib fractures [which Nicole had], is child abuse. By that, we mean that it takes grabbing the child’s chest and squeezing to bend those ribs and cause the fractures____
Infants in major motor vehicle accidents, or in trauma where infants and small children [sic], if they fall out of a 5, 10 or 15-story building, certainly they can be killed in the fall, but you don’t get rib fractures. In major motor vehicle accidents, it’s incredibly rare, even with massive injuries to the child, you can break arms and legs and die — but you don’t get rib fractures in these infants and small babies....
So, rib fractures in infants less than 2 years of age are considered indicative or pathenemonic for physical abuse.
In foster care, Nicole thrived for nine months without injury. Her foster parents testified that while in their care, Nicole’s health was “excellent” and “she was not ill at all.” However, Nicole was returned to Appellant’s custody at the end of that time, and two months after that she was dead in his arms.
As stated earlier, Dr. Balding performed the autopsy on Nicole. In addition to his *109 testimony that he could find no reason for her death other than suffocation, he testified he found “bruises to the scalp ... right on the top of the head,” and that X-rays showed “fractures to the leg that were unexplained.” He also testified that “[wjithout an explanation of those, one frankly suspects some type of an inflicted injury on the child.”
Regarding the burn to Nicole’s face, the intake worker testified Appellant “said that he was holding her over a vaporizer, and that’s how she got the burn.” Dr. Falcon, however, testified he was told “the steamer had fallen and hot water had splashed over the child’s face.” Dr. Falcon was “99 percent” sure it was Appellant who told him, and not Mrs. Diaz, but regardless of who actually told him, Appellant was present when Dr. Falcon was told that different version of the events.
Ms. Amlin also spoke with Appellant about the bum to Nicole, and testified she asked him, “Did you not see that the child was in distress? Steam is very hot. If she was burning, did the child not struggle or cry out or try to move away from the source of the heat?” In response, Appellant indicated “that she made no movement at all,” and “didn’t give any indication that [she] was being hurt.” And with that response, Appellant’s credibility evaporated, because the severity of the burn to Nicole’s face made it implausible that she did not instantly and violently recoil in pain, and every member of Appellant’s court-martial knew it once they saw the pictures of that injury, admitted as Prosecution Exhibit 10. See James, 55 M.J. at 301 (appellate examination of photographs in the record); Charley, 189 F.3d at 1271 (appellant’s lack of credibility at trial important factor in harmless error analysis).
Regarding the bruises to Nicole’s cheek and chest, the intake worker testified Appellant said he caused them “by kissing on her — that he sucked on her like he likes to suck on girls.” Appellant’s wife also testified that Appellant caused Nicole’s bruises by kissing her.
Appellant argues in Granted Issue I that evidence of the prior injuries to Nicole was inadmissible propensity evidence. The majority agrees. Unfortunately, the majority gets it very wrong, and in the process completely ignores Supreme Court precedent.

The Law

M.R.E. 404(b) states:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]
Thus, this Court has said that such evidence is admissible under M.R.E. 404(b) when: (1) it reasonably supports a finding that the accused committed the prior acts; (2) it makes a fact of consequence at the trial more or less probable; and (3) its probative value substantially outweighs any prejudicial effect. United States v. Humpherys, 57 M.J. 83, 90 (C.A.A.F.2002)(quoting United States v. Reynolds, 29 M.J. 105, 109 (C.M.A.1989)).[3]
As to the first prong, the standard for satisfying it is “quite low.” United States v. Dorsey, 38 M.J. 244, 246-47 (C.M.A.1993)(citing Huddleston, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771). That is especially true in child abuse death cases, which “present very unusual problems of proof. The circumstances of these cases suggest an even wider discretion than usual in admitting what is conceded to be extremely prejudicial evidence, consisting of other acts of abuse[.]” *110 United States v. Leight, 818 F.2d 1297, 1304 (7th Cir.1987)(child abuse death ease).
Thus, in United States v. Harris, 661 F.2d 138 (10th Cir.1981), also a child abuse death case, the court found evidence of healing bone and rib fractures was admissible, even though the prior injuries were unrelated to the victim’s death, and even though there was no direct evidence the appellant inflicted those injuries. There was only inference from circumstantial evidence. In finding this evidence admissible, the court quoted from United States v. Woods, 484 F.2d 127, 133 (4th Cir.1973), as follows:
We think also that when the crime is one of infanticide or child abuse, evidence of repeated incidents is especially relevant because it may be the only evidence to prove the crime. A child of the age of Paul [eight months] ... is a helpless, defenseless unit of human life. Such a child is too young, if he survives, to relate the facts concerning the attempt on his life, and too young, if he does not survive, to have exerted enough resistance that the marks of his cause of death will survive him. Absent the fortuitous presence of an eyewitness, infanticide or child abuse by suffocation would largely go unpunished.
(Emphasis added.) See also United States v. White, 23 M.J. 84 (C.M.A.1986)(evidence of prior rib fractures and bruises to body and scalp admissible in child abuse death case, even though no direct evidence the appellant caused those injuries; only inference from circumstantial evidence). Applying these principles to Appellant’s case, I conclude all the evidence of Nicole’s prior injuries was admissible.

Nicole’s Burned Face

There is no doubt Appellant inflicted the burn to Nicole’s face, because he admitted it numerous times. Thus, the first part of the three-part test for admissibility of this evidence is satisfied. As for the second part— whether the burn to her face made a fact of consequence at the trial more or less probable — the answer to that is unequivocally yes.
One of the elements the Government had to prove in this case was that Appellant’s act of suffocating Nicole was with the specific intent to kill or inflict great bodily harm on her. Manual for Courts-Martial, United States (2002 ed.) [hereinafter MCM], Part IV, para. 43.b.(2)(d). However, direct evidence of subjective intent many times is not available, leaving circumstantial evidence of that intent as the only mode of proof. And frequently, that circumstantial evidence is of prior, similar acts of the accused. See Humpherys, 57 M.J. at 91. Such prior acts help prove intent by lessening the possibility that the subsequent act was accidental — a common sense proposition the Supreme Court has embraced but which a majority of this Court today rejects.
Thus, in McGuire, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385, the defendant was charged with murdering his infant daughter. To help prove its case, the prosecution introduced evidence of prior injuries to the daughter to prove “battered child syndrome.” Specifically, the prior injuries were rectal tears and rib fractures, and based on these prior injuries, two experts testified the victim was a battered child. Id. at 65, 112 S.Ct. 475.
The defendant in McGuire was convicted of the murder, and thereafter, he filed a petition for habeas corpus relief in the district court. His petition was denied, but he appealed to the Court of Appeals, which reversed and “ruled that the prior injury evidence was erroneously admitted to establish battered child syndrome, because no evidence linked McGuire to the prior injuries and no claim had been made at trial that the baby died accidentally.” Id. at 66, 112 S.Ct. 475. To the contrary, McGuire generally denied any involvement in the child’s death, and instead speculated that she fell off the couch, or someone else killed her. Id. at 65, 112 S.Ct. 475.
At this point, I note the similarity between the facts in Appellant’s case and those in McGuire. In both, there was a general denial of wrongdoing at trial, countered with evidence of prior injuries of the victim that experts testified indicated abuse, even though the prior injuries were not linked by direct evidence to the accused. I also note *111 that regarding this issue, the result reached by this Court’s majority, and its rationale, are identical to the result reached by the Court of Appeals in McGwire, and its rationale (i.e., evidence of the prior injuries was inadmissible because there was no proof the accused caused the injuries, and there was only a general denial of wrongdoing at trial, not a specific claim of accident).
Yet in McGuire, the Supreme Court made clear that this result and rationale are incorrect. Such evidence of prior injuries, it held, is admissible, despite an accused’s general denial of wrongdoing rather than a specific claim of accident, and despite an absence of direct evidence linking him to the prior injuries. In so holding, the Court reasoned as follows:
Because the prosecution had charged McGuire with second-degree murder, it was required to prove that Tori’s death was caused by the defendant’s intentional act. Proof of Tori’s battered child status helped to do just that; although not linked by any direct evidence to McGuire, the evidence demonstrated that Tori’s death was the result of an intentional act[.]
... [T]he Court of Appeals also relied on the theory that, because no claim was made at trial that Tori died accidentally, the battered child syndrome evidence was irrelevant and violative of due process. This ruling ignores the fact that the prosecution must prove all the elements of a criminal offense beyond a reasonable doubt. In this second-degree murder case, for example, the prosecution was required to demonstrate that the killing was intentional. By eliminating the possibility of accident, the evidence regarding battered child syndrome was clearly probative of that essential element____ The Court of Appeals, however, ruled that the evidence should have been excluded because McGuire did not raise the defense of accidental death at trial. But the prosecution’s burden to prove every element of the crime is not relieved by a defendant’s tactical decision not to contest an essential element of the offense.
502 U.S. at 68-69, 112 S.Ct. 475 (citations omitted)(emphasis added).
The same is true in Appellant’s case, and applying the law and logic of McGuire, I conclude the evidence of Nicole’s burned face satisfies the second part of the three-part test for admissibility because it helped prove Nicole’s death was caused by Appellant’s intentional act of suffocating her — something the Government was required to prove and could not be precluded from proving simply because the defense chose generally to deny causing Nicole’s death rather than claim accident. See also United States v. Robles-Ramos, 47 M.J. 474 (C.A.A.F.1998)(prior instances of spouse abuse admissible to prove charged abuse was not an accident); White, 28 M.J. at 87 (prior rib and other injuries admissible to prove intent and absence of accident in child abuse death ease); United States v. Boise, 916 F.2d 497, 501 (9th Cir.1990)(prior abuse probative of material issue of absence of accident); Leight, 818 F.2d at 1301, 1303 (same); State v. Norlin, 134 Wash.2d 570, 951 P.2d 1131, 1136-37 (1998)(same).
That leaves only the third part of the test for admissibility — whether the probative value of evidence of Nicole’s burned face substantially outweighed any prejudicial effect. In this child abuse death case where there were no eyewitnesses and only circumstantial evidence to prove Nicole’s death was not an accident, I conclude the probative value of that evidence outweighed any prejudicial effect. See Boise, 916 F.2d at 502 (argument that judge abused discretion by admitting evidence of prior abuse “lacks merit”); Leight, 818 F.2d at 1304 (“not an abuse of discretion to conclude that the probative value of earlier acts of child abuse outweighed the unfair prejudice of showing uncharged wrongs — even of a reprehensible character”); Harris, 661 F.2d at 142 (“A battered child is not a pretty picture. But in our view the evidence of other injuries was highly probative in nature.”); Norlin, 951 P.2d at 1137 (probative value of such evidence “was great”).
Thus, evidence of Nicole’s burned face satisfied Supreme Court precedent, as well as this Court’s three-part test for admissibility, *112 and was properly admitted to help prove an essential element of the Government’s case— that when Appellant suffocated Nicole, he did so intentionally and not by accident. That said, the military judge did not abuse his discretion by admitting that evidence. To hold otherwise not only ignores the prevailing Supreme Court jurisprudence applied by state and other federal courts, but also establishes a different and more difficult evidentiary standard for the prosecution of child abuse cases in the military justice system.
Nonetheless, the majority does hold otherwise, based on its conclusion that because McGuire is a habeas corpus case, it “is not a valid precedent for deciding an issue involving Military Rule of Evidence.” 59 M.J. at 95 n. 3. Yet even if this conclusion is correct, it significantly overstates the issue in Appellant’s case, and in doing so “misses the legal point.” United States v. Mitchell, 58 M.J. 446, 448 (C.A.A.F.2003).
As previously stated, there is a three-part test for admissibility under M.R.E. 404(b). The second part of that test is that the evidence must make a fact of consequence at the trial more or less probable. Reynolds, 29 M.J. at 109. In other words, the evidence must be relevant under M.R.E. 401, the evidentiary rule cited by Reynolds in support of this part of the test.[4] It is with respect to this limited and basic question only that McGuire is both instructive and precedential in Appellant’s case.
As the majority correctly notes, because McGuire was a habeas corpus case, it was not concerned with “whether the California courts correctly applied the [state] rules of evidence[.]” 59 M.J. at 95 n. 3. Rather, McGuire was concerned only with “whether the admission of the evidence [of prior misconduct] violated McGuire’s federal constitutional rights.” 502 U.S. at 68, 112 S.Ct. 475. In holding that it did not violate his constitutional rights, the Supreme Court concluded “that the prior injury evidence was relevant to an issue in the case,” specifically, intent. Id. at 70, 112 S.Ct. 475. In other words, the Court concluded that the prior act evidence was “relevant” within the meaning of Federal Rule of Evidence 101. See Fed.R.Evid. 1101(e) (Federal Rules of Evidence apply in habeas corpus cases).
That being the case, the evidence of Nicole’s burned face was equally relevant under M.R.E. 401, because: (1) “[t]he definition of ‘relevant evidence’ found within [M.R.E.] 401 is taken without change from the Federal Rule,” MCM, Analysis of the Military Rules of Evidence at A22-33, and (2) “as the Military Rules of Evidence are largely derived from the Federal Rules of Evidence, we look to the federal Courts of Appeals for treatment of the issue[s].” United States v. Grant, 56 M.J. 410, 414 (C.A.A.F.2002).
Thus, McGuire does not stand for the broad proposition that evidence of Nicole’s burned face was admissible under M.R.E. 404(b). What it stands for is the narrow proposition that evidence of Nicole’s burned face was relevant in Appellant’s case under M.R.E. 401, and therefore satisfied one of the three distinct legal tests that all must be met before evidence is admissible under M.R.E. 404(b). That is all it stands for, and it does so regardless of the fact it is a habeas corpus case.
This is a legal reality the majority cannot refute, so rather than confront it on the merits, they simply ignore and obscure the issue with an overly broad and misleading conclusion that McGuire does not apply to M.R.E. 404(b) issues as a whole. But it does apply, in the limited way I just described, and the majority’s failure either to acknowledge or refute that fact calls into question the viability of their entire opinion.

Nicole’s Other Injuries

For the reasons just discussed, all of the evidence of Nicole’s other injuries also satisfied the second and third parts of this Court’s three-part test for admissibility, i.e., was more probative than prejudicial of the material fact of an intentional killing. The only question remaining is whether evidence of those injuries also satisfied the first part *113 of the test, i.e., reasonably supported a finding that Appellant caused those other injuries.
As to Nicole’s cheek and chest bruises, the answer is clearly yes, because Appellant admitted to the intake worker that he caused them, and his wife testified that he caused them. As to Nicole’s fractured ribs, broken leg, and scalp bruises, the answer is also yes, because the standard is not whether direct evidence “established] that Appellant inflicted” those injuries, as the majority seems to imply, 59 M.J. at 94 (emphasis added), but whether given all the circumstances of this case, the evidence could “reasonably support” a finding by the members that Appellant inflicted those injuries. Reynolds, 29 M.J. at 109; Huddleston, 485 U.S. at 685, 108 S.Ct. 1496 (“sufficient evidence to support a finding by the jury that the defendant committed the similar act”). In my view, the evidence easily supported that finding because it clearly established Appellant “had both the inclination and the opportunity to commit the crimes.” Charley, 189 F.3d at 1271.
First, Appellant inflicted second and third degree burns on Jasmine and Nicole, and his confessed reason for burning Jasmine was “to see what she would do.” Second, Appellant and his wife were the primary caretakers of the children. Third, Dr. Stuemky testified rib injuries like Nicole’s could only be caused by abuse. Fourth, Nicole was only a few months old at the time of these injuries, and was therefore immobile and unable to self-inflict them. Fifth, there was no suggestion that Appellant’s wife inflicted these injuries. Sixth, there was no suggestion anyone else inflicted them. And seventh, the sheer number of Nicole’s injuries reduced the likelihood they were caused by others who periodically might have watched her.
Given these facts, I conclude the members of Appellant’s court-martial could reasonably have found that Appellant inflicted Nicole’s rib, leg, and head injuries. See Boise, 916 F.2d at 502 (evidence supported conclusion the appellant caused the child’s prior rib injuries, where he and his wife were the primary caregivers, and there was no suggestion she mistreated the child); Harris, 661 F.2d at 141 (facts and circumstances permitted jury to infer that defendant caused prior injuries where “[a]ny suggestion that it was possibly the mother who mistreated [the child] is only that[,] a suggestion”); Norlin, 951 P.2d at 1137 (evidence supported conclusion the appellant caused prior rib injuries, where he and his wife were the primary caregivers, and wife testified prior injuries occurred when child was alone with the appellant).
As a result, all the evidence of Nicole’s prior injuries satisfied this Court’s three-part test for admissibility, and the military judge did not abuse his discretion in admitting it. Moreover, the military judge’s response to Dr. Stuemky’s improper testimony did much to cure the problem created by that testimony.

The Military Judge’s Response

Immediately after Dr. Stuemky’s testimony contradicted the military judge’s express instructions, trial defense counsel moved for a mistrial, but the military judge denied the request. Instead, the judge had Dr. Stuemky leave the courtroom and gave the members the following detailed instructions to cure any prejudice to Appellant from Dr. Stuemky’s improper testimony:
Members of the court, early on in this trial and during the case on several occasions, I’ve told you that you have to decide the facts in this case, and you have to make a determination as to whether a crime occurred. You have to make a determination as to the believability or credibility of witnesses. And you have to follow my instructions. Earlier on when we did the voir dire portion of the trial, I told you in my preliminary instructions — -I told you that you were required to follow the instructions that I gave you, and you all assured me that you could do that.
I’m going to give you some instructions concerning expert testimony. An expert— a person is allowed to testify as an expert because his testimony may be helpful to you in coming to conclusions about issues. The witness you’ve been hearing has been qualified as an expert in a specific disci *114 pline because his knowledge, skill, experience, training or education may assist you in understanding the evidence, or in determining a fact in issue. But [t]he point is that you have to determine the fact in issue. Do you understand that? MEMBERS: [Affirmative responses.]
MJ: You are not required to accept the testimony of an expert witness or give it any more or less weight than that of an ordinary witness. But you should consider the expert’s experience and qualifications in the specific area.
Expert witnesses are allowed to render opinions, and those opinions are only allowed if they’re helpful to you, the fact finder. But again, bear in mind that you have the ultimate determination as to a conclusion about the issues in this case.
An expert witness cannot tell you that he thinks a crime occurred, because that’s not helpful to you, because you have to decide that. An expert witness cannot tell you that a witness is lying or truthful, or he cannot even tell you that a crime occurred. Because you have to decide that based on all the evidence, and only the evidence, that’s been presented to you in the courtroom. Do you understand that? MEMBERS: [Affirmative responses.]
MJ: To the extent that Dr. Stuemky opined that he thought a crime occurred, and that a particular specific person committed that crime, you cannot consider that, because that’s not helpful to you. You have to make that decision. Do you understand that?
MEMBERS: [Affirmative responses.]
MJ: As I told you earlier this morning, there’s nobody that can help you in that regard, because you have to make your decision based on the evidence that’s presented to you here in court. Nobody else has the unique situation of being present to hear all the evidence in court. Do you understand what I’m telling you? MEMBERS: [Affirmative responses.]
MJ: I’m telling you that you must disregard any testimony about whether a crime occurred, or whether this soldier committed a crime. Do you understand that?
MEMBERS: [Affirmative responses.]
MJ: And you can’t consider that for any reason during your deliberations. Do you understand that?
MEMBERS: [Affirmative responses.]
MJ: I’ve gotten affirmative responses by every member to this point. You can consider evidence that certain — as to an opinion about whether injuries were consistent with SIDS or not consistent with SIDS, or whether the injuries were consistent with a child-abuse type death. But you cannot consider any testimony as to what this witness thought as to who did it. Do you understand that?
MEMBERS: [Affirmative responses.]
Having instructed the members in this manner and determined that they collectively understood and would follow them, the judge then took the added step of polling the members individually, asking each one if he or she understood and could follow the instructions. In response, each member stated for the record that he or she understood and would follow them.

Conclusion

In light of (1) these curative measures taken by the military judge; (2) the strong expert testimony that SIDS could not be the cause of Nicole’s death; (3) the strong expert testimony there was no cause of death other than suffocation; (4) the fact that only Appellant could have suffocated Nicole; (5) Appellant’s prior abuse of Nicole and subsequent abuse of Jasmine; and (6) Appellant’s complete lack of credibility, I conclude that the improper testimony in this case that Nicole’s death was a homicide did not substantially influence the members’ findings of guilty, and that as a result, the military judge did not err in refusing to grant a mistrial. See Charley, 189 F.3d at 1272 (“In light of the strength of the properly admitted testimony ..., and the relatively modest amount of erroneously admitted testimony, we cannot say that the erroneously admitted portions of the testimony substantially affected the *115 trial’s outcome!!.]”); United States v. Taylor, 53 M.J. 195, 198 (C.A.A.F.2000)(mistrial is “drastic remedy” needed only to prevent “miscarriage of justice”; curative instruction is “preferred”); Rule for Courts-Martial 915(a)(mistrial when “manifestly necessary in the interest of justice”).
I would affirm the decision of the court below.

. Throughout this opinion, I speak only in terms of Dr. Stuemky’s improper testimony. Nonetheless, to the extent others also testified improperly, I find that harmless too, for the same reasons I find Dr. Stuemky's improper testimony harmless.

. ' There is no question that CPT Tremaine was a person subject to the UCMJ.

. This Court decided United States v. Reynolds, 29 M.J. 105 (C.M.A.1989), after the Supreme Court decided Huddleston v. United States, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). Interestingly, Reynolds did not cite Huddleston, even though the three-part test announced in Reynolds is identical in all material respects to the three-part test announced in Huddleston for admissibility of 404(b) evidence. Nonetheless, because the two tests are the same; because Huddleston involves Federal Rules of Evidence 401, 403, and 404(b), and Reynolds involves Military Rules of Evidence 401, 403, and 404(b); and because these Military Rules are "taken without change from the Federal Rule[s],” Reynolds should not be applied in a manner inconsistent with Huddleston. See Manual for Courts-Martial, United States (2002 ed.), Analysis of the Military Rules of Evidence at A22-33 and 34.

. Militaiy Rule of Evidence 401 states: “ ‘Relevant evidence’ means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.”